# EXHIBIT J

AO 93  (SDNY Rev. 01/17) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of New York

| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | Case No. **2 3 MAG 0 0 4 4 3** |
| *or identify the person by name and address)* | ) | |
| See Attachment A | ) | |
| | ) | |
| | ) | |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Southern _____ District of _____ New York _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment A

The search and seizure are related to violation(s) of *(insert statutory citations)*:

7 USC 9(1), 13(a)(5), and 17 CFR 180.1 (commodities fraud); 7 USC 13(a)(2) (commodities and swap manipulaton); 18 USC 1343 (wire fraud); and 18 USC 1956(a)(1)(A)(i), 1956(h), and 1957 (concealment money laundering, illegal money transferring, and cspiracy to commit the same).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before _____
*(not to exceed 14 days)*

☐ in the daytime  6:00 a.m. to 10 p.m.   ☑ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the Clerk of the Court.
☑ Upon its return, this warrant and inventory should be filed under seal by the Clerk of the Court. _____
*USMJ Initials*

☑ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☑ for   30   days *(not to exceed 30)*.
☐ until, the facts justifying, the later specific date of _____

Date and time issued:   1/19/23  9:23 AM        _Bobby Moses_
                                                   *Judge's signature*

City and state:   New York, NY _____        Hon. Barbara Moses
                                                   *Printed name and title*

AO 93  (SDNY Rev. 01/17) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| Certification |
|---|

    I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the Court.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**Attachment A**

## I. Devices Subject to Search and Seizure

The devices that are the subject of this search and seizure warrant (the "Subject Devices") were seized from AVRAHAM EISENBERG on or about December 26, 2022 and are described as follows:

    a.  Subject Device-1 is a cellphone manufactured by OnePlus;

    b.  Subject Device-2 is a Samsung cellphone with IMEI 357111200989170;

    c.  Subject Device-3 is a Samsung cellphone with serial number R9WR903SPAD; and

    d.  Subject Device-4 is a Razer laptop with serial number BY2132M55303941.

## II. Review of ESI on the Subject Devices

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained on the Subject Device for evidence, fruits, and instrumentalities of violations of 7 U.S.C. §§ 9(1), 13(a)(5) and 17 C.F.R. § 180.1 (commodities fraud), 7 U.S.C. § 13(a)(2) (commodities and swap manipulation), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(h), and 1957 (concealment money laundering, illegal money transferring, and conspiracy to commit the same), all in connection with a scheme to commit market manipulation on a platform called Mango Markets, then launder the proceeds (the "Subject Offenses"), described as follows:

a.    Evidence of the creation and use of cryptocurrency wallets and accounts on cryptocurrency exchanges used in preparing for, perpetrating, or receiving funds from the Subject Offenses;

b.    Evidence, including documents, images, and communications, reflecting any preparation for the Subject Offenses, including but not limited evidence reflecting research about manipulating cryptocurrency prices; research about potential targets for market manipulation; tests of purchasing and selling MNGO or MNGO Perpetuals; tests of transferring cryptocurrency to and from Mango Markets and other cryptocurrency exchanges used in the Subject Offenses; the planned steps in the Subject Offenses; the anticipated timing of the Subject Offenses; and planning for laundering funds from the Subject Offenses;

c.    Evidence, including documents, images, and communications, reflecting acts in furtherance of the Subject Offenses and the transfer of funds obtained from the Subject Offenses;

d.    Evidence, including documents, images, and communications, reflecting efforts to avoid to destroy or conceal information about the Subject Offenses, including but not limited to efforts to delete messages about the Subject Offenses and to prevent victims of the Subject Offenses from reporting information about the scheme to law enforcement;

2022.01.31

e.     Evidence, including documents, images, and communications, relating to AVRAHAM EISENBERG's relocation from the United States to Israel shortly after committing the Subject Offenses;

f.     Evidence, including documents, images, and communications, reflecting AVRAHAM EISENBERG's knowledge of the laws prohibiting wire fraud, securities fraud, commodities fraud, and market manipulations, including but not limited to evidence of EISENBERG's participation in lawsuits involving laws related to those subjects and EISENBERG's research or communication about lawsuits and criminal cases related to those subjects;

g.     Evidence reflecting the identities of, and communications among, any co-conspirators or accomplices in the Subject Offenses;

h.     Evidence, including documents and communications, reflecting the state of mind of AVRAHAM EISENBERG and other participants in the Subject Offenses, including communications reflecting false (purportedly exculpatory) explanations of any participant's involvement in the Subject Offenses;

i.     Information that would assist in identifying and locating victims or witnesses;

j.     Documents, spreadsheets, communications, and ledgers tracking cryptocurrency transfers and/or cryptocurrency payments;

k.     Passwords or other information needed to access or identify computer or other online accounts, storage media, or other places where additional evidence, fruits, or instrumentalities of the Subject Offenses may be located;

l.     Information pertaining to cryptocurrency digital wallets that may contain proceeds of the Subject Offenses;

m.     Information relating to the ownership and disposition of criminal proceeds, including bank accounts, cryptocurrency wallets, accounts with centralized cryptocurrency exchanges, and other financial accounts;

n.     Evidence relating to the use of financial accounts and transactions in furtherance of the Subject Offenses (including the means and methods used to obtain the accounts and funds therein, and how the transactions were undertaken);

o.     Evidence concerning the technical expertise of AVRAHAM EISENBERG and any other participants in the Subject Offenses;

p.     Location data, including but not limited to geolocation reporting and location history data and metadata associated with other files that would place AVRAHAM EISENBERG and any co-conspirators and aiders and abettors in the Subject Offenses, as well as the devices they used, in specific places at specific times, and would indicate the use of their devices during those times;

2

2017.08.02

q.      Information regarding the registration of other email accounts, computer servers, or other computer network infrastructure, including servers and Internet domains, or online communications facilities, payment for such online facilities or services, transfers of funds in furtherance of the Subject Offenses, and proceeds of the Subject Offenses;

r.      Evidence of EISENBERG's efforts to conceal his involvement in the Subject Offenses and avoid detection by law enforcement, including efforts to obtain other people's personal identifying information, to hide cryptocurrency, and to flee the country; and

s.      Evidence concerning any other online accounts, any computer devices or servers, or any other location where evidence falling within the foregoing categories could be stored, including any passwords or encryption keys needed to access such evidence.

2017.08.02

3

AO 106 (SDNY Rev. 01/17)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of New York

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

See Attached Affidavit and its Attachment A

) )
) )
) )
) )
) )

Case No.   2 3 MAG 0 0 4 4 3

## APPLICATION FOR A SEARCH AND SEIZURE WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attached Affidavit and its Attachment A

located in the _____Southern_____ District of _____New York_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attached Affidavit and its Attachment A

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section(s) | Offense Description(s) |
|---|---|
| 7 USC 9(1), 13(a)(5), and 17 CFR 180.1; 7 USC 13(a)(2); 18 USC 1343; and 18 USC 1956(a), 1956(h), and 1957 | Commodities fraud; commodities and swap manipulation; wire fraud; concealment money laundering, illegal money transferring, and conspiracy to commit the same |

The application is based on these facts:

See Attached Affidavit and its Attachment A

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Brandy Racz (BR)
Brandi Racz, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __1/19/23__

_____
*Judge's signature*

City and state:  New York, NY

Hon. Barbara Moses
*Printed name and title*

2 3 MAG 0 0 4 4 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of the Application of the United States Of America for a Search and Seizure Warrant for Four Electronic Devices Seized from Avraham Eisenberg on or about December 26, 2022, USAO No. 2022R00646 | **TO BE FILED UNDER SEAL**<br><br>**Agent Affidavit in Support of Application for Search and Seizure Warrant** |

SOUTHERN DISTRICT OF NEW YORK) ss.:

BRANDON RACZ, being duly sworn, deposes and says:

## I.  Introduction

### A.  Affiant

1.      I have been a Special Agent with the Federal Bureau of Investigation for approximately seven years.  As an FBI Special Agent, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  I am currently assigned to an FBI squad in the FBI's New York Field Office that investigates securities and commodities fraud, along with other white-collar offenses, including market manipulation and insider trading.  During my time in the FBI, I have received training about investigating and have participated in investigations financial crimes, including financial crimes related to cryptocurrencies.  I have also received training about executing, and have participated in executing, numerous search and seizure warrants involving electronic evidence.

2.      I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the electronic devices specified below (the "Subject Devices") for the items and information described in Attachment A. This affidavit is based upon my personal knowledge; my review of documents and other evidence; my

2017.08.02

2

conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information ("ESI"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**B. The Subject Devices**

3.     The Subject Devices were seized from AVRAHAM EISENBERG on or about December 26, 2022 and are particularly described as follows:

      a.     Subject Device-1 is a cellphone manufactured by OnePlus;

      b.     Subject Device-2 is a Samsung cellphone with IMEI 357111200989170;

      c.     Subject Device-3 is a Samsung cellphone with serial number R9WR903SPAD; and

      d.     Subject Device-4 is a Razer laptop with serial number BY2132M55303941.

4.     Based on my training, experience, and research, I know that the Subject Devices have capabilities that allow them to serve as, among other things, wireless telephones, digital cameras, portable media players, GPS navigation devices, word-processing tools, internet-access devices, and personal digital assistants.

5.     The Subject Devices are presently located in the Southern District of New York.

**C. The Subject Offenses**

6.     For the reasons detailed below, I believe that there is probable cause to believe that the Subject Device contains evidence, fruits, and instrumentalities of violations of 7 U.S.C. §§ 9(1), 13(a)(5) and 17 C.F.R. § 180.1 (commodities fraud), 7 U.S.C. § 13(a)(2) (commodities and

3

2017.08.02

swap manipulation), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(h), and 1957 (concealment money laundering, illegal money transferring, and conspiracy to commit the same), all in connection with a scheme to commit market manipulation on a platform called Mango Markets, then launder the proceeds (the "Subject Offenses").

## II.  Probable Cause

### A.  Probable Cause Regarding Subject's Commission of the Subject Offenses

7.     On or about December 23, 2022, the Honorable Gabriel W. Gorenstein authorized a complaint (the "Complaint") charging AVRAHAM EISENBERG with committing commodities fraud, in violation of 7 U.S.C. §§ 9(1), 13(a)(5) and 17 C.F.R. § 180.1, and commodities manipulation, in violation of 7 U.S.C. § 13(a)(2), in connection with a scheme to commit market manipulation on a platform called Mango Markets.

8.     On or about January 6, 2023, the Honorable Sarah Netburn approved a search warrant authorizing the Government to search, among other things, electronic accounts belonging to AVRAHAM EISENBERG, including accounts on Twitter, Facebook, Discord, and Google. A copy of the search warrant and its supporting application (collectively, the "January 6 Warrant") is attached hereto as Exhibit 1, and the Complaint is attached as Exhibit 1 to the January 6 Warrant. Both are incorporated by reference herein.

9.     On or about January 9, 2023, a grand jury in the Southern District of New York returned an indictment (the "Indictment"), charging AVRAHAM EISENBERG with committing commodities fraud, in of 7 U.S.C. §§ 9(1), 13(a)(5) and 17 C.F.R. § 180.1, commodities manipulation, in violation of 7 U.S.C. § 13(a)(2), and wire fraud, in violation of 18 U.S.C. § 1343, in connection with a scheme to commit market manipulation on a platform called Mango Markets. A copy of the Indictment is attached hereto as Exhibit 2 and is incorporated by reference herein.

10.    As explained in the Complaint and the Indictment:

2017.08.02

4

a.     Mango Markets is a decentralized cryptocurrency exchange that has its own native crypto token, called MNGO.  Investors can buy and sell MNGO and other cryptocurrencies on Mango Markets.  Investors on Mango Markets can also buy and sell perpetual futures ("Perpetuals") based on the relationship between the value of MNGO and the value of a crypto stablecoin called USD Coin ("USDC"), which is designed to be pegged to the dollar.  Perpetuals are "swaps" under the Commodity Exchange Act.  An investor who buys a Perpetual for MNGO stands to profit if the value of MNGO rises relative to the value of USDC, and an investor who sells a Perpetual for MNGO stands to profit if the value of MNGO falls relative to the value of USDC.  Finally, Mango Markets allows investors to borrow cryptocurrency from the exchange, in amounts based on the value of the borrower's portfolio, and to withdraw that borrowed cryptocurrency.  Compl. ¶¶ 4, 71-8; Indictment ¶¶ 6-14.

b.     In or about October 2022, AVRAHAM EISENBERG participated in a scheme to steal approximately $110 million by artificially manipulating the price of MNGO Perpetuals on Mango Markets (the "Market Manipulation Scheme").  The scheme worked as follows: EISENBERG used an account that he controlled on Mango Markets to sell a large amount of Perpetuals for MNGO and used a separate account on Mango Markets to purchase those same Perpetuals.  In other words, EISENBERG sold himself MNGO Perpetuals.  EISENBERG then engaged in a series of large purchases of MNGO, with the objective of artificially increasing the price of MNGO relative to USDC, which had the effect of increasing the price of MNGO Perpetuals on Mango Markets.  That purchasing achieved the desired effect, causing the price of MNGO Perpetuals on Mango Markets to increase precipitously over the course of approximately 20 minutes.  Over that time span of approximately 20 minutes, the price of MNGO Perpetuals rose

2017.08.02

USAO_SDNY_01_00011841

from approximately 0.0382 USDC/MNGO to approximately 0.54 USDC/MANGO, an increase of approximately 1300 percent.  Compl. ¶¶ 5, 9-17; Indictment ¶¶ 15-18.

       c.    As the price of MNGO Perpetuals on Mango Markets rose as a result of the Market Manipulation Scheme perpetrated by AVRAHAM EISENBERG the value of the MNGO Perpetuals that EISENBERG had purchased also rose.  Because Mango Markets allows investors to borrow and withdraw cryptocurrency based on the value of their assets on the platform, the increase in the value of the MNGO Perpetuals EISENBERG had purchased allowed EISENBERG to borrow, then withdraw, approximately $110 million worth of various cryptocurrencies from Mango Markets, which came from deposits of other investors in the Mango Markets exchange. When EISENBERG borrowed and withdrew that cryptocurrency, he had no intention to repay the borrowed funds.  Accordingly, after EISENBERG borrowed and withdrew essentially all of the cryptocurrency deposits on the Mango Markets platform, EISENBERG ceased manipulating the price of MNGO Perpetuals, causing the price of MNGO Perpetuals to fall significantly.  Due to EISENBERG's withdrawals, other investors with deposits on Mango Markets lost much, or all, of those deposits.  Compl. ¶¶ 5, 9-17; Indictment ¶¶ 19-22.

       11.    Based on my review of publicly available blockchain data and records from a cryptocurrency company called Circle, I have learned, in substance and in part, the following:

       a.    As part of the Market Manipulation Scheme, AVRAHAM EISENBERG transferred approximately $110 million worth of cryptocurrency from Mango Markets to other cryptocurrency wallets and accounts.

       b.    One of the accounts to which EISENBERG transferred cryptocurrency was an account at Circle ("Circle Account-1") that EISENBERG opened with his own passport.

2017.08.02

6

USAO_SDNY_01_00011842

Specifically, EISENBERG transferred over $57 million worth of USDC from Mango Markets to Circle Account-1.

        c.      Shortly after transferring USDC from Mango Markets to Circle Account-1, EISENBERG again moved that money to other cryptocurrency wallets and accounts.[1]

      12.     Virtual currencies, such as USDC, are "commodities" under the Commodity Exchange Act ("CEA"). *See, e.g., C.F.T.C. v. McDonnell*, 287 F. Supp. 3d 213 (E.D.N.Y. 2018) ("A 'commodity' encompasses virtual currency both in economic function and in the language of the statute."); *United States v. Reed*, No. 20 Cr. 500 (JGK), 2022 WL 597180, at *3 (S.D.N.Y. Feb. 28, 2022) (finding "defendant had ample notice from the broad definition of commodities under the CEA that cryptocurrencies were within the definition of commodities").

      13.     MNGO Perpetuals are also "swaps" under the CEA. *See* 7 U.S.C. § 1(47)(A); *see also CFTC v. HDR Global Trading Ltd., et al.*, 20 Cv. 8132 (LTS), Dkt. 91 (S.D.N.Y. May 5, 2022) (consent order decreeing that, "in accordance with Section 1(a)(47)(iii) and (vi) of the Act . . . the swap solicited or accepted by BitMEX included 'perpetual swaps' or 'perpetual contracts,'" and that BitMEX "operated a facility for the trading of swaps").

      14.     Based on the foregoing, and the information in the Complaint, I respectfully submit there is probable cause to believe that AVRAHAM EISENBERG engaged in the Subject Offenses.

**B. Probable Cause Justifying Search of the Subject Devices**

      15.     As explained in the Complaint, on or about October 12, 2022 – the day after the Market Manipulation Scheme – AVRAHAM EISNEBERG flew from the United States to Israel. Compl. ¶ 18.

---

[1] I noted a typographical error in the Complaint.  Paragraph 10(d) states: "[T]he Exchange-1 Account sent approximately 5,000,100 USDC to a Mango Markets account."  That subparagraph should say "Solana Wallet-1" instead of "the Exchange-1 Account."

2017.08.02

USAO_SDNY_01_00011843

16.     Based on my conversations with other law enforcement officers and my review of law enforcement reports, I have learned, in substance and in part, the following:

a.     On or about December 26, 2022, AVRAHAM EISENBERG returned to the United States from Israel and flew into Puerto Rico.  He was travelling alone.

b.     When EISENBERG arrived, law enforcement officers arrested him in the airport, pursuant to an arrest warrant issued in conjunction with the Complaint.

c.     In connection with the arrest, law enforcement officers seized the Subject Devices.  Accordingly, there is probable cause to believe that the Subject Devices belong to EISENBERG.

17.     Based on my training and experience, as well as my communications with other law enforcement officers, I know that individuals who perpetrate financial frauds, including schemes involving cryptocurrency, commonly use electronic devices, such as the Subject Devices, to plan, carry out, and communicate about those schemes.  Such individuals often us electronic devices to, among other things, communicate with others about the scheme, including to discuss planning and brag about execution; store screenshots, logs, notes, and other records used to plan and carry out the scheme; conduct online research about cryptocurrencies and cryptocurrency platforms to prepare for the scheme; store passwords and login information for cryptocurrency wallets, cryptocurrency exchanges, and other blockchain-based platforms used to carry out the scheme or store the proceeds of the scheme; delete electronic evidence of their involvement in the scheme; and research other ways to hide their involvement in the scheme.  Individuals who own cryptocurrency also often use electronic devices as "cold" wallets for cryptocurrency (that is, wallets that are not permanently connected to the internet or stored on a cryptocurrency exchange) and to keep track of passwords for both hot and cold wallets.

2017.08.02

USAO_SDNY_01_00011844

18.     Consistent with my training and experience, there is probable cause to believe that the Subject Devices will contain evidence and fruits of, and are instrumentalities of, the Subject Offenses for the following reasons:

a.     As explained in the Complaint and Indictment, AVRAHAM EISENBERG perpetrated the Market Manipulation Scheme using cryptocurrencies and through cryptocurrency exchanges.  Based on my training and experience, my conversations with other law enforcement officers, and my conversations with employees of cryptocurrency exchanges, I know that trading cryptocurrencies and accessing cryptocurrency exchanges requires using electronic devices, such as the Subject Devices.  I have also learned that individuals who trade cryptocurrencies and access cryptocurrency exchanges typically use electronic devices, such as the Subject Devices, to, among other things, obtain, send, and store information about cryptocurrency wallets and accounts; passwords and login information for cryptocurrency exchanges and cryptocurrency accounts; and notes, records, and photographs about cryptocurrency holdings and cryptocurrency accounts.

b.     As explained in the application for the January 6 Warrant, after committing the Market Manipulation Scheme, EISENBERG posted about the scheme from a Twitter account ("Twitter Account-1").  Warrant ¶¶ 18-22.  EISENBERG also posted on Twitter about Department of Justice announcements related to financial fraud and market manipulation, which is evidence EISENBERG knew he was breaking the law when he committed the Market Manipulation Scheme.  *Id.*  Based on my training and experience and my review of records from Twitter, I know that individuals use electronic devices, such as the Subject Devices, to access Twitter; post, review messages, and send direct messages on Twitter; and take, store and send photographs of posts on Twitter.

2017.08.02

USAO_SDNY_01_00011845

c.      Based on my training and experience, I know that individuals who perpetrate criminal schemes related to cryptocurrency often discuss those schemes with other cryptocurrency traders, including over electronic devices.   Consistent with my training and experience, as explained in the application for the January 6 Warrant, I have participated in an interview of an individual ("Individual-1")[2] who contacted law enforcement after the Market Manipulation Scheme.   Warrant ¶¶ 23-26.   Individual-1 knew EISENBERG for approximately two years and communicated with him over, among other things, Facebook, Discord, and Signal. *Id.* Individual-1's electronic communications with EISNEBERG included communications about Mango Markets and EISENBERG leaving the country to Israel after committing the Market Manipulation Scheme because he was afraid of prosecution.  *Id.*

d.      As explained in the application for the January 6 Warrant, EISENBERG posted messages about the Market Manipulation Scheme on a messaging platform called Discord, using a particular Discord account ("Discord Account-1").  Warrant ¶¶ 27-31.  Some of those posts were from before the Market Manipulation Scheme and were deleted shortly after that scheme. *Id.* Others were from after the Market Manipulation Scheme and showed that EISENBERG eventually took responsibility for the scheme.  *Id.* This is further evidence that EISENBERG used electronic devices, such as the Subject Devices, to communicate about the Market Manipulation Scheme.

e.      Based on my training and experience, I know that individuals who open accounts on cryptocurrency exchanges are often required to provide email addresses and phone numbers, which the exchanges use to communicate with the accountholders.  As explained in the January 6 Warrant, EISENBERG controlled multiple Google accounts (the "Google Accounts"),

---

[2] Individual-1 stated, in substance and in part, that Individual-1 was involved in cryptocurrency trading and was interested in potentially receiving compensation for providing information to law enforcement.

2017.08.02

USAO_SDNY_01_00011846

including an account registered in the name of another person. Warrant ¶¶ 32-36. EISENBERG used the email addresses and phone numbers associated with those Google accounts to, among other things, create cryptocurrency accounts that he used in carrying out the Market Manipulation Scheme. *Id.* Because the Google Accounts can be accessed only with electronic devices, such as the Subject Devices, this is further reason to believe the Subject Devices will contain evidence of, and were instrumentalities of, the Subject Offenses.

19.     Based on my training and experience, as well as my communications with other law enforcement officers, I know that, like most individuals, people who perpetrate financial frauds, including cryptocurrency-related schemes, often use multiple electronic devices. Using multiple electronic devices allows such individuals to keep multiple copies of important information and use certain devices for particular tasks. I also know that individuals often use cloud-storage systems to back up information from electronic devices, and that, if multiple devices are connected to the same cloud-storage systems, those devices can contain copies of the same data. Accordingly, there is probable cause to believe that all of the Subject Devices will contain fruits, instrumentalities, and evidence of the Subject Offenses.

20.     Based on my training and experience, I know that electronic devices, such as the Subject Devices, often store IP logs and location information. That information is valuable because it can help identify the user of the devices, corroborate that the user of the device accessed particular webpages, and show where the user of the device was, which can help prove the existence of an interstate wire.

21.     Finally, based on my training and experience, as well as my communications with other law enforcement officers, I know that electronic files, or remnants of such files, can be

2017.08.02

USAO_SDNY_01_00011847

recovered for months or even years after they have been created or saved on an electronic device. Even when such files have been deleted, they can often be recovered months or years later.

22.     Based on the foregoing, I respectfully submit there is probable cause to believe that the Subject Devices will contain evidence and fruits of the Subject Offenses, and that they are instrumentalities of the Subject Offenses.  In particular, I believe the Subject Devices are likely to contain the following information:

a.     Evidence of the creation and use of cryptocurrency wallets and accounts on cryptocurrency exchanges used in preparing for, perpetrating, or receiving funds from the Subject Offenses;

b.     Evidence, including documents, images, and communications, reflecting any preparation for the Subject Offenses, including but not limited evidence reflecting research about manipulating cryptocurrency prices; research about potential targets for market manipulation; tests of purchasing and selling MNGO or MNGO Perpetuals; tests of transferring cryptocurrency to and from Mango Markets and other cryptocurrency exchanges used in the Subject Offenses; the planned steps in the Subject Offenses; the anticipated timing of the Subject Offenses; and planning for laundering funds from the Subject Offenses;

c.     Evidence, including documents, images, and communications, reflecting acts in furtherance of the Subject Offenses and the transfer of funds obtained from the Subject Offenses;

d.     Evidence, including documents, images, and communications, reflecting efforts to avoid to destroy or conceal information about the Subject Offenses, including but not limited to efforts to delete messages about the Subject Offenses and to prevent victims of the Subject Offenses from reporting information about the scheme to law enforcement;

2017.08.02

12

e.      Evidence, including documents, images, and communications, relating to AVRAHAM EISENBERG's relocation from the United States to Israel shortly after committing the Subject Offenses;

f.      Evidence, including documents, images, and communications, reflecting AVRAHAM EISENBERG's knowledge of the laws prohibiting wire fraud, securities fraud, commodities fraud, and market manipulations, including but not limited to evidence of EISENBERG's participation in lawsuits involving laws related to those subjects and EISENBERG's research or communication about lawsuits and criminal cases related to those subjects;

g.      Evidence reflecting the identities of, and communications among, any co-conspirators or accomplices in the Subject Offenses;

h.      Evidence, including documents and communications, reflecting the state of mind of AVRAHAM EISENBERG and other participants in the Subject Offenses, including communications reflecting false (purportedly exculpatory) explanations of any participant's involvement in the Subject Offenses;

i.      Information that would assist in identifying and locating victims or witnesses;

j.      Documents, spreadsheets, communications, and ledgers tracking cryptocurrency transfers and/or cryptocurrency payments;

k.      Passwords or other information needed to access or identify computer or other online accounts, storage media, or other places where additional evidence, fruits, or instrumentalities of the Subject Offenses may be located;

13

2017.08.02

l.      Information pertaining to cryptocurrency digital wallets that may contain proceeds of the Subject Offenses;

m.      Information relating to the ownership and disposition of criminal proceeds, including bank accounts, cryptocurrency wallets, accounts with centralized cryptocurrency exchanges, and other financial accounts;

n.      Evidence relating to the use of financial accounts and transactions in furtherance of the Subject Offenses (including the means and methods used to obtain the accounts and funds therein, and how the transactions were undertaken);

o.      Evidence concerning the technical expertise of AVRAHAM EISENBERG and any other participants in the Subject Offenses;

p.      Location data, including but not limited to geolocation reporting and location history data and metadata associated with other files that would place AVRAHAM EISENBERG and any co-conspirators and aiders and abettors in the Subject Offenses, as well as the devices they used, in specific places at specific times, and would indicate the use of their devices during those times;

q.      Information regarding the registration of other email accounts, computer servers, or other computer network infrastructure, including servers and Internet domains, or online communications facilities, payment for such online facilities or services, transfers of funds in furtherance of the Subject Offenses, and proceeds of the Subject Offenses;

r.      Evidence of EISENBERG's efforts to conceal his involvement in the Subject Offenses and avoid detection by law enforcement, including efforts to obtain other people's personal identifying information, to hide cryptocurrency, and to flee the country; and

2017.08.02

USAO_SDNY_01_00011850

s.    Evidence concerning any other online accounts, any computer devices or servers, or any other location where evidence falling within the foregoing categories could be stored, including any passwords or encryption keys needed to access such evidence.

## III.  Procedures for Searching ESI

### A.  Review of ESI

23.    Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained on the Subject Devices for information responsive to the warrant.

24.    In conducting this review, law enforcement may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses.  Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and

- performing electronic keyword searches through all electronic storage areas to determine the existence and location of search terms related to the subject matter of the investigation. (Keyword searches alone are typically inadequate to detect all information subject to seizure. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.)

15

USAO_SDNY_01_00011851

25.     Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant.   Depending on the circumstances, however, law enforcement may need to conduct a complete review of all the ESI from the Subject Devices to locate all data responsive to the warrant.

**B.  Return of the Subject Devices**

26.     If the Government determines that the Subject Devices are no longer necessary to retrieve and preserve the data on the device, and that the Subject Devices are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return the Subject Devices, upon request.   Computer data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

**IV.  Conclusion and Ancillary Provisions**

27.     Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachment A to this affidavit and to the Search and Seizure Warrant.


BRANDON RACZ
Special Agent, FBI


Sworn to before me on
[January 19, 2023

HON. BARBARA MOSES
UNITED STATES MAGISTRATE JUDGE

16

2017.08.02

## Attachment A

### I. Devices Subject to Search and Seizure

The devices that are the subject of this search and seizure warrant (the "Subject Devices") were seized from AVRAHAM EISENBERG on or about December 26, 2022 and are described as follows:

    a.  Subject Device-1 is a cellphone manufactured by OnePlus;

    b.  Subject Device-2 is a Samsung cellphone with IMEI 357111200989170;

    c.  Subject Device-3 is a Samsung cellphone with serial number R9WR903SPAD; and

    d.  Subject Device-4 is a Razer laptop with serial number BY2132M55303941.

### II. Review of ESI on the Subject Devices

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained on the Subject Device for evidence, fruits, and instrumentalities of violations of 7 U.S.C. §§ 9(1), 13(a)(5) and 17 C.F.R. § 180.1 (commodities fraud), 7 U.S.C. § 13(a)(2) (commodities and swap manipulation), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(h), and 1957 (concealment money laundering, illegal money transferring, and conspiracy to commit the same), all in connection with a scheme to commit market manipulation on a platform called Mango Markets, then launder the proceeds (the "Subject Offenses"), described as follows:

a.    Evidence of the creation and use of cryptocurrency wallets and accounts on cryptocurrency exchanges used in preparing for, perpetrating, or receiving funds from the Subject Offenses;

b.    Evidence, including documents, images, and communications, reflecting any preparation for the Subject Offenses, including but not limited evidence reflecting research about manipulating cryptocurrency prices; research about potential targets for market manipulation; tests of purchasing and selling MNGO or MNGO Perpetuals; tests of transferring cryptocurrency to and from Mango Markets and other cryptocurrency exchanges used in the Subject Offenses; the planned steps in the Subject Offenses; the anticipated timing of the Subject Offenses; and planning for laundering funds from the Subject Offenses;

c.    Evidence, including documents, images, and communications, reflecting acts in furtherance of the Subject Offenses and the transfer of funds obtained from the Subject Offenses;

d.    Evidence, including documents, images, and communications, reflecting efforts to avoid to destroy or conceal information about the Subject Offenses, including but not limited to efforts to delete messages about the Subject Offenses and to prevent victims of the Subject Offenses from reporting information about the scheme to law enforcement;

2022.01.31

e.      Evidence, including documents, images, and communications, relating to AVRAHAM EISENBERG's relocation from the United States to Israel shortly after committing the Subject Offenses;

f.      Evidence, including documents, images, and communications, reflecting AVRAHAM EISENBERG's knowledge of the laws prohibiting wire fraud, securities fraud, commodities fraud, and market manipulations, including but not limited to evidence of EISENBERG's participation in lawsuits involving laws related to those subjects and EISENBERG's research or communication about lawsuits and criminal cases related to those subjects;

g.      Evidence reflecting the identities of, and communications among, any co-conspirators or accomplices in the Subject Offenses;

h.      Evidence, including documents and communications, reflecting the state of mind of AVRAHAM EISENBERG and other participants in the Subject Offenses, including communications reflecting false (purportedly exculpatory) explanations of any participant's involvement in the Subject Offenses;

i.      Information that would assist in identifying and locating victims or witnesses;

j.      Documents, spreadsheets, communications, and ledgers tracking cryptocurrency transfers and/or cryptocurrency payments;

k.      Passwords or other information needed to access or identify computer or other online accounts, storage media, or other places where additional evidence, fruits, or instrumentalities of the Subject Offenses may be located;

l.      Information pertaining to cryptocurrency digital wallets that may contain proceeds of the Subject Offenses;

m.      Information relating to the ownership and disposition of criminal proceeds, including bank accounts, cryptocurrency wallets, accounts with centralized cryptocurrency exchanges, and other financial accounts;

n.      Evidence relating to the use of financial accounts and transactions in furtherance of the Subject Offenses (including the means and methods used to obtain the accounts and funds therein, and how the transactions were undertaken);

o.      Evidence concerning the technical expertise of AVRAHAM EISENBERG and any other participants in the Subject Offenses;

p.      Location data, including but not limited to geolocation reporting and location history data and metadata associated with other files that would place AVRAHAM EISENBERG and any co-conspirators and aiders and abettors in the Subject Offenses, as well as the devices they used, in specific places at specific times, and would indicate the use of their devices during those times;

USAO_SDNY_01_00011854

     q.     Information regarding the registration of other email accounts, computer servers, or other computer network infrastructure, including servers and Internet domains, or online communications facilities, payment for such online facilities or services, transfers of funds in furtherance of the Subject Offenses, and proceeds of the Subject Offenses;

     r.     Evidence of EISENBERG's efforts to conceal his involvement in the Subject Offenses and avoid detection by law enforcement, including efforts to obtain other people's personal identifying information, to hide cryptocurrency, and to flee the country; and

     s.     Evidence concerning any other online accounts, any computer devices or servers, or any other location where evidence falling within the foregoing categories could be stored, including any passwords or encryption keys needed to access such evidence.

2017.08.02

USAO_SDNY_01_00011855

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**23 MAG 122**

> In the Matter of a Warrant for All
> Content and Other Information
> Associated with Multiple Accounts
> Containing Stored Electronic
> Communications, USAO Reference
> No. 2022R00646

**TO BE FILED UNDER SEAL**

**AGENT AFFIDAVIT**

### Agent Affidavit in Support of Application for a Search Warrant
### for Stored Electronic Communications

STATE OF NEW YORK    )
                      ) ss.
COUNTY OF NEW YORK  )

      BRANDON RACZ, Special Agent, being duly sworn, deposes and states:

## I. Introduction

### A. Affiant

      1.  I have been a Special Agent with the Federal Bureau of Investigation for approximately seven years. As an FBI Special Agent, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I am currently assigned to an FBI squad in the FBI's New York Field Office that investigates securities and commodities fraud, along with other white-collar offenses, including market manipulation and insider trading. During my time in the FBI, I have received training about investigating and have participated in investigations financial crimes, including financial crimes related to cryptocurrencies. I have also received training about executing, and have participated in executing, numerous search and seizure warrants involving electronic evidence.

USAO_SDNY_01_00011856

**B.  The Providers, the Subject Accounts, and the Subject Offenses**

2.  I make this affidavit in support of an application for search warrants pursuant to 18 U.S.C. § 2703 for all content and other information associated with the following accounts and servers (collectively, the "Subject Accounts"):

a.  A Twitter account with the username @avi_eisen ("Subject Account-1") and account ID 2839135427, accessed at the URL https://twitter.com/avi_eisen and maintained and controlled by Twitter ("Provider-1"), headquartered at 1355 Market Street, Suite 900, in San Francisco, California;

b.  A Facebook account with the username "Avraham Eisenberg" ("Subject Account-2"), accessed at https://www.facebook.com/people/Avraham-Eisenberg/100009952574823/ and maintained and controlled by Meta Platforms, Inc. ("Provider-2"), headquartered at 1601 Willow Road, Menlo Park, California 94025; and

c.  The following Discord accounts ("Subject Account-3" and "Subject Account-4") and server ("Subject Server-1") maintained and controlled by Discord, Inc. ("Provider-3"), headquartered at 444 De Haro Street, Suite 200, San Francisco, CA 94107:

| User ID | Username(s) | Referred to Herein As |
|---|---|---|
| 470697531823620116 | AvrahamEisenberg#5451 | **Subject Account-3** |
| 281233046227779585 | CrunchWrapSupreme#1469 | **Subject Account-4** |

| Server ID | Server Link | Referred to Herein As |
|---|---|---|
| 782504674103656489 | discord.gg/9RjPjCdGwK | **Subject Server-1** |

12.06.2018

3

    d.   The Google accounts associated with the following email addresses, maintained and controlled by Google LLC ("Provider-4"), headquartered at 1600 Amphitheatre Parkway, Mountain View, CA:

       i.   bochen.clean@gmail.com ("Subject Account-5")

      ii.   avi@thimessolutions.com ("Subject Account-6")

    iii.   613ike@gmail.com ("Subject Account-7")

    3.   The information to be searched is described in the following paragraphs and in Attachment A to the proposed warrant.

    4.   As detailed below, there is probable cause to believe that the Subject Accounts contain evidence, fruits, and instrumentalities of violations of 7 U.S.C. §§ 9(1), 13(a)(5) and 17 C.F.R. § 180.1 (commodities fraud); 7 U.S.C. § 13(a)(2) (commodities and swap manipulation); 18 U.S.C. § 371 (conspiracy to commit commodities fraud); 18 U.S.C. §§ 1343 and 1349 (wire fraud, securities fraud, and conspiracy to commit the same); 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(h), and 1957 (concealment money laundering, illegal money transferring, and conspiracy to commit the same), all in connection with a scheme to commit market manipulation on a platform called Mango Markets, then launder the proceeds (the "Subject Offenses").

    5.   This affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers, as well as my training and experience concerning the use of electronic devices and messaging platforms in criminal activity. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

12.06.2018

USAO_SDNY_01_00011858

### C. Services and Records of the Providers

6. I have learned the following about Twitter, which is Provider-1:

a. Twitter offers electronic messaging and online social media services. Twitter allows its users to create their own profile pages, which can include a short biography, a photo of themselves, and location information. Twitter also permits users to post and read 280-character messages called "tweets," and to restrict access to their "tweets" to individuals whom they approve. In addition, Twitter's subscribers can send "direct messages," or "DMs" to other subscribers, which are typically only viewable by the sender and recipient of the direct message. These features are described in more detail below. A subscriber using Twitter's services can access his or her account from any computer or other electronic device connected to the Internet. In addition to content that the user posts, Twitter, like many online social media providers, pulls and stores identifying information when the user is active on the platform, including device identifiers and Internet Protocol ("IP") addresses of the user's Internet connection to Twitter.

b. Twitter maintains the following records and information with respect to every subscriber account:

i. *Biographical Information.* Twitter allows its users to create personal profiles pages that are available to the public. These pages may include a short biography, photographs, and location information of the user.

ii. *Subscriber and Billing Information.* Twitter collects and maintains identifying information about each subscriber, including, for example, name, username, address, telephone number, and alternate email addresses. Twitter may "verify" some users, displaying a blue checkmark beside the username to affirm to public viewers that the account belongs to the person or entity that claims to operate it. Twitter may request and store verification data on those user accounts it has verified, including copies of government-issued identification documents.

5

USAO_SDNY_01_00011859

Twitter also maintains records concerning the date the account was created, the IP address of the user at the time of account creation, the current status of the account (e.g., active or closed), the length of service, and the types of services utilized by the subscriber. Additionally, for paying subscribers, Twitter maintains records of the subscriber's means and source of payment, including any credit card or bank account number.

      iii.    *Tweets.* As discussed above, Twitter's users can use their accounts to post "tweets" of 280 characters or fewer. Each tweet includes a timestamp that displays when the tweet was posted. Twitter's users can also "favorite," "retweet," or reply to tweets of other users, or click a "share" button that allows users to link to the tweet on different outlets, including in private messages. In addition, when a tweet includes a username, often proceeded by "@," Twitter designates that tweet a "mention" of the identified user. In the "Connect" tab for each account, Twitter provides the user with a list of other users who have favorited or retweeted the user's own tweets, as well as a list of all the tweets that include the user's username (*i.e.*, a list of all mentions and replies for that username). By enabling the "precise location" setting, Twitter's users can also choose to display location data in their tweets.

      iv.    *Media files.* Twitter users can also include media such as images or videos in their tweets. Each account is provided a user gallery, which stores media files that the user has shared on Twitter's network, including images and videos that were uploaded from another service.

      v.    *Link Information.* Twitter's users can also include links to a website in their tweets. By using Twitter's linking service, a longer website link can be converted into a shortened link, which allows it to fit into the 280-character limit. The linking service measures how many times a link has been clicked.

12.06.2018

USAO_SDNY_01_00011860

vi.    *Associated Users.* A user can also "follow" other users, which means that the user subscribes to the other users' tweets and site updates.  Each user profile page includes a list of the people who are following that user (i.e., the user's "followers" list) and a list of people whom that user follows (i.e., the user's "following" list).   Twitter's users can "unfollow" users whom they previously followed, and they can also adjust the privacy settings for their profile so that their tweets are visible only to the people whom they approve, rather than to the public (which is the default setting).  Limiting account visibility in this way is called "going private." A user can also group other users into "lists" that display on the right side of the user's home page.

vii.    *Direct Messages.* A user can also send direct messages, or DMs, to one of his or her followers, or to other users whose settings accept messages from any Twitter accountholder.   The user may either click a "share" button on a tweet that generates a direct message to another user that links to that tweet, or the user may start a direct message conversation without linking to a tweet.  These messages are visible only to the sender and the recipient. If one party deletes the messages from his or her own account, the message and associated data may still be stored on the other party's account. In addition to retaining content of messages, Twitter retains log data associated with them, analogous to call detail records.

viii.    *Search Information.* Twitter has at time included a search function that enables its users to search all public tweets for keywords, usernames, or subject, among other things.

ix.    *Third-party Information.* Users can connect their accounts to third-party websites and applications, which may grant these websites and applications access to parts of the users' account data.

12.06.2018

USAO_SDNY_01_00011861

x.   *Transactional Information.* Twitter also typically retains certain transactional information about the use of each account on its system. This information can include records of logins, such as timestamps of activity, information about the user's device, and IP addresses used to access Twitter. Twitter calls this information "Log Data."

xi.   *Customer Correspondence.* Twitter also typically maintains records of any customer service contacts with or about the subscriber, including any inquiries or complaints concerning the subscriber's account, and including reports and complaints that the subscriber has made to Twitter about other accounts.

xii.   *Preserved Records.* Twitter also maintains preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f).

7.   I have learned the following about Facebook, which is Provider-2:

a.   Meta Platforms, Inc. owns and operates a free-access social networking website called Facebook that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

b.   Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

USAO_SDNY_01_00011862

c.  Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

d.  Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

e.  Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or

9

12.06.2018

USAO_SDNY_01_00011863

her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

f.  Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

g.  Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger.  These chat communications are stored in the chat history for the account.  Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

h.  If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

i.  Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

12.06.2018

USAO_SDNY_01_00011864

j.  Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

k.  Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

l.  Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

m.  In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

n.  Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

o.  Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users

11

USAO_SDNY_01_00011865

may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

    p.   As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook

"friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

q.  Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

8.  I have learned the following about Discord, which is Provider-3:

a.  Discord is a proprietary freeware voice over Internet protocol (VoIP) application for gaming and other online communities. The Discord client was built on the Electron framework using web technologies, which allows it to be multi-platform and run on personal computers and websites. The Discord application has services such as free voice chat servers for users and dedicated server infrastructure, video calling and screen sharing, direct calling, instant messaging, videoconferences, and GameBridge API that allows game developers to support integration with Discord within games.  Discord users can create a "server" for free and then invite other users to join the server in order to communicate with another user.  A server can be configured as public, meaning anyone can join, or it can be configured to be private.  To participate in a private server, a user must be invited by another user who already belongs to that private server.  Servers are broken down into subcategories, or "channels," where users can connect with

12.06.2018

USAO_SDNY_01_00011867

each other by chatting or calling.  Users can also communicate through direct messages, which are private chats created between 1-10 users.

b.  Discord users are able to create and maintain a friends list, participate in multiple servers or communication channels, and set their current status indicator to appear online, away, or invisible to other users.  Discord servers can have multiple text-based and voice channels, both public and private.  Text messages sent in these channels are persistent, stay visible, and are stored indefinitely.  Users are able to communicate in only one channel at a time, but can easily navigate between channels.  Discord users are able to direct message or private message to other Discord users.  Discord users are able to view what game their Discord friends and other Discord server members are playing.

c.  During the registration process for a Discord account, Discord asks subscribers to provide basic client information to include, among other things, a username and email address. Additionally, other online applications like Steam, Facebook, Spotify, and Twitter, can be connected to a user's Discord account.  Discord can be used from within a web browser, can be installed on a Windows, Mac, or Linux computer, or can be installed on an Apple iOS or Android mobile device.  Discord has an optional paid version called "Discord Nitro" that provides a user with additional features.  Therefore, the computers of Discord likely contain information concerning a user's account and their use of Discord services and possibly other connected services, such as account access information, email information, and account application and payment information. Discord also assigns a user identification number to each account.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify and locate the account user(s).

14

USAO_SDNY_01_00011868

     d.  Upon creating a Discord account, a Discord user is assigned a unique 18-digit Discord user ID.  The Discord user then must create a username (which includes a # and a four-digit number) and an account password.  The Discord user may change the username and password without having to open a new Discord account.

     e.  A subscriber using Discord's services can access his or her account from any computer connected to the Internet or by downloading the desktop or mobile Discord application.

     f.  In my training and experience, service providers like Discord typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of login (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website) and other log files that reflect usage of the account. In addition, service providers often have records of the IP address[1] used to register the account and the IP addresses associated with particular logins to and activity on the account. Because every device that connects to the Internet must use an IP address, IP addresses can help identify which computers or other devices were used to access the account.

---

[1] An IP address is a unique numeric address used by computers on the Internet. There are two types of IP addresses used on the Internet today. The IPv4 address uses 32 bits and looks like a series of four numbers, each in the range from 0-255, separated by periods - for example 123.4.56.78. Due to the growth of the Internet, the creation of additional IP addresses was needed; therefore, a new version of IP called 1Pv6, uses 128 bits for IP addresses - for example 2610:0020:6Fl5:0015:0000:0000:0000:0027, or its abbreviated form of 2610:20:6Fl5:15::27. Every computer connected to the Internet must be assigned an IP address so that Internet traffic may be directed properly from its source to its destination. Each IP address is uniquely assigned to a single connected device at any single point in time.

12.06.2018

USAO_SDNY_01_00011869

g.  In some cases, Discord users may communicate directly with Discord about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Discord typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

h.  The computers or servers of Discord are likely to contain all the material just described, including stored electronic communications and information concerning subscribers and their use of Discord, such as account access information, transaction information, and account activation.

i.  Based on the Discord Privacy Policy, last modified February 25, 2022, and available online, I know the following about the collection of preservation of data at Discord:[2]

i.  Discord collects information from users when they voluntarily provide such information, such as when they register for access to the Discord application and related Internet services (the "Services").  Information that Discord collects may include but not be limited to username, email address, and any messages, images, transient VOIP data (to enable communication delivery only) or other content users send via the chat feature.

ii.  When users interact with Discord through the Services, Discord receives and stores certain information such as an IP address, device ID, and the user's activities within the Services.  Discord may store such information or such information may be included in databases owned and maintained by affiliates, agents or service providers.  The Services may use such information and pool it with other information to track, for example, the total number of visitors

---

[2] *See* https://discordapp.com/privacy (last accessed March 20, 2022).

12.06.2018

USAO_SDNY_01_00011870

to Discord's website, the number of messages users have sent, and the domain names of visitors' Internet service providers.

   iii. Discord may conduct research on its customer demographics, interests and behavior based on the information collected. This research may be compiled and analyzed on an aggregate basis, and Discord may share this aggregate data with its affiliates, agents, and business partners. Discord may also disclose aggregated user statistics in order to describe its services to current and prospective business partners, and to other third parties for other lawful purposes.

   iv. Users may give Discord permission to collect their information in other services. For example, a user may connect a social networking service ("SNS") such as Facebook or Twitter to their Discord account. When a user does this, it allows Discord to obtain information from those accounts (for example, a user's friends or contacts).

   v. Discord employs cookies and similar technologies to keep track of users' local computer's settings such as which account users have logged into and notification settings. Cookies are pieces of data that sites and services can set on a user's browser or device that can be read on future visits. Discord may expand its use of cookies to save additional data as new features are added to the Service. In addition, Discord uses technologies such as web beacons and single-pixel gifs to record log data such as open rates for emails sent by the system.

   vi. Discord may use third party web site analytic tools such as Google Analytics on its website that employ cookies to collect certain information concerning use of its Services. However, users can disable cookies by changing their browser settings.

   vii. A user may see a Discord Service advertised in other applications or websites. After clicking on one of these advertisements and installing a Discord Service, the user

12.06.2018

USAO_SDNY_01_00011871

will become a user of the Service.  Advertising platforms, which include Twitter and Facebook (and whose software development kits are integrated within Discord's Service), may collect information for optimizing advertising campaigns outside of the Service.

9.  I have learned the following about Google, which is Provider-4:

a.  Google offers to the public a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications using a username and password.  Once logged into a Google account, a user can connect to Google's full suite of services offered to the general public.

b.  In particular, as relevant here, Google offers free, web-based email services to the public.  Specifically, Google allows subscribers to maintain email accounts through Gmail under the domain gmail.com and other domain names chosen by the user or an enterprise.  A subscriber using Google's services can access his or her email account from any computer connected to the Internet.

c.  Google maintains the following records and information with respect to every Google account that has email services:

i.  *Email contents*.  In general, any email (which can include attachments such as documents, images, and videos) sent to or from a subscriber's account, or stored in draft form in the account, is maintained on Google's servers unless and until the subscriber deletes the email.  If the subscriber does not delete the email, it can remain on the Google's computers indefinitely.  Even if the subscriber deletes the email, it may continue to be available on Google's servers for a certain period of time.  Google also allows users to send emails in "confidential" mode, which enables a user to set an expiration date for messages or revoke access at any time,

18

12.06.2018

USAO_SDNY_01_00011872

and recipients of the confidential message will be unable to forward, copy, print, and download the message.

        ii.    *Subscriber and billing information.*  Google collects and maintains (typically unverified) identifying information about each subscriber, including, for example, name, username, address, telephone number, recovery and alternate email addresses, and sign-in phone numbers. A recovery email address, which can be associated with more than one Gmail account, is used to regain access to an account if a password has been forgotten or a user has been locked out of their account. An alternate email address is a non-Gmail account that a user has provided that can be used to sign into a Gmail account. A sign-in phone number is a phone number that can be used as a primary/additional login identifier to access an account. Google also maintains records concerning the date on which the account was created, the Internet protocol ("IP")[3] address of the user at the time of account creation, the current status of the account (*e.g.*, active or closed), the length of service, and the types of Google services utilized by the subscriber. Finally, Google maintains records regarding (1) fetching and forwarding email addresses, which are email accounts from which the primary account receives emails and forwards emails, respectively; (2) email aliases, domain aliases or separate domains associated with the account, which are means by which accounts with other domain names or other email addresses can be associated with a primary Google account; (3) other Google accounts that have access to the primary account, which access can be granted by the user of the primary account; and (4) other email accounts that are associated with the primary Google account.

---

[3] Based on my training and experience, each electronic device connected to the Internet must be assigned an IP address so that communications from or directed to that electronic device are routed properly.

12.06.2018

USAO_SDNY_01_00011873

      iii.    *Device Information.*  Google may also collect and maintain information identifying devices (including both computers and mobile devices) used to access accounts, including, for example, device serial number, a GUID or Global Unique Identifier, a phone number, MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI").

      iv.    *Cookie Data.*  Google typically uses features to track the activity of users of its accounts, including whether or not the user of an account accesses other accounts at Google using the same computer or device, or accesses accounts maintained by other companies while logged into an account.  One of the ways they do that is by using cookies, a string of characters stored on the user's computer or web browser that is recognized by Google when a computer visits its site or logs into an account.

      v.    *Transactional information.*  Google also typically retains certain transactional information about the use of each account on its system, including records of login and logout events relating to Google accounts, including user IP addresses and dates and timestamps.

      vi.    *Customer correspondence.*  Google also typically maintains records of any customer service contacts with or about the subscriber, including any inquiries or complaints concerning the subscriber's account.

      vii.    *Preserved and backup records.*  Google also maintains preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon

12.06.2018

USAO_SDNY_01_00011874

receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f).  Google may also maintain backup copies of the foregoing categories of records pursuant to its own data retention policy.

  j. Google also maintains records with respect to other Google services, which it stores in connection with a Google account and includes the following:

   i. *Google Contacts.*  Google provides an address book for Google accounts through Google Contacts.  Google Contacts stores contacts the user affirmatively adds to the address book, as well as contacts the user has interacted with in Google products.  Users can send messages to more than one contact at a time by manually creating a group within Google Contacts or communicate with an email distribution list called a Google Group.  Google preserves contacts indefinitely, unless the user deletes them.

   ii. *Google Calendar*.  Google provides users with the ability to create and maintain online calendars, in which they can add appointments, events, and reminders, which are synchronized across registered computers and mobile devices.  Users can share their calendars with other users, allowing the maintenance of joint calendars.  Google preserves appointments indefinitely, unless the user deletes them.

   iii. *Google Messaging Content*.  Google provides several messaging services including Duo, Messages, Hangouts, Meet, and Chat.  These services enable real-time text, voice, and/or video communications through browsers and mobile applications, and also allow users to send and receive text messages, videos, photos, locations, links, and contacts.  Google may retain a user's messages if the user has not disabled that feature or deleted the messages.

USAO_SDNY_01_00011875

iv.   *Google Drive content*.   Google Drive is a cloud storage service automatically created for each Google account.  Users can store an unlimited number of documents created by Google productivity applications like Google Docs (Google's word processor), Google Sheets (Google's spreadsheet program), Google Forms (Google's web form service), and Google Slides (Google's presentation program).  Users can also upload files to Google Drive, including photos, videos, PDFs, and text documents, until they hit the storage limit.  Google provides users with a certain amount of free storage, currently 15 gigabytes, and users can purchase a storage plan through Google to store additional content.  A user can access content stored on Google Drive by logging into his or her Google account through any computer or other electronic device that is connected to the Internet.  Users can also share files stored on Google Drive with others and grant those with access the ability to edit or comment.  Google maintains a record of who made changes and when to documents edited in Google applications.  Android device users can also use Google Drive to backup certain data from their device.  Android backups on Google Drive may include mobile application data, device settings, file downloads, and short message service ("SMS") messages.  If a user subscribes to Google's cloud storage service, Google One, they can opt to backup all the data from their device to Google Drive.  Google preserves files stored in Google Drive indefinitely, unless the user deletes them.

v.   *Google Maps*.   Google Maps is service which can be searched for addresses or points of interest.  Google Maps can provide users with turn-by-turn directions from one location to another using a range of transportation options (driving, biking, walking, etc.) and real-time traffic updates.  Users can share their real-time location with others through Google Maps by using the Location Sharing feature.  If users log into their Google account while using Google

12.06.2018

USAO_SDNY_01_00011876

Maps, they can save locations to their account, keep a history of their Google Maps searches, and create personalized maps. Google stores Maps data indefinitely, unless the user deletes it.

    vi. *Google Photos*. Google Photos is a cloud-based photo and video storage service through which users can share or receive photos and videos with others. Users have the option to sync their mobile phone or device photos to Google Photos. Google also retains the metadata—or data that provides information about the data in question, such as the time and date of creation, the author or creator, the means of its creation, the purpose of the data, among other data—for photos and videos that are uploaded to Google Photos if that data is included by the user as part of the upload. This metadata includes what is known as exchangeable image file format (or "Exif") data, and can include GPS location information for where a photo or video was taken.

    vii. *Google Voice*. Google Voice is a service through which a Google account can be assigned a telephone number that can be used to make, record, and forward phone calls and send, receive, store, and forward SMS and MMS messages from a web browser, mobile phone, or landline. Google Voice also includes a voicemail service. Records are stored indefinitely, unless the user deletes them.

    viii. *Location History data*. Google collects and retains data about the location at which Google account services are accessed from any mobile device, as well as the periodic location of Android devices while they are in use. This location data can derive from a range of sources, including GPS data, Wi-Fi access points, cell-site locations, geolocation of IP addresses, sensor data, user searches, and Bluetooth beacons within range of the device. This location data may be associated with the Google account signed-in or registered to the device when Location Services are activated on the device and the user has enabled certain global settings for their Google account, such as Location History or Web & App Activity tracking. Google

12.06.2018

USAO_SDNY_01_00011877

maintains these records indefinitely for accounts created before June 2020, unless the user deletes it. Accounts created after June 2020 auto-delete Location History after eighteen months unless the user affirmatively changes the retention setting to indefinite retention or auto-deletion at three months.

        ix.   *Chrome Browser and "My Activity" Data.*  Google offers a free web browser service called Google Chrome which facilitates access to the Internet. Chrome retains a record of a user's browsing history and allows users to save favorite sites as bookmarks for easy access. If a user is logged into their Google account on Chrome and has the appropriate settings enabled, their browsing history, bookmarks, and other browser settings may be saved to their Google account in a record called My Activity. My Activity also collects and retains data about searches that users conduct within their own Google account or using the Google Internet search engine available at http://www.google.com while logged into their Google account.

        k.  As explained herein, information stored in connection with a Google account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Google user's stored electronic communications, IP logs, and other data retained by Google, can indicate who has used or controlled the Google account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email content, and stored documents and photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Google account at a relevant time. Further, Google account activity can show how and when the account was accessed or used. For example, as described herein, Google logs the IP

12.06.2018

USAO_SDNY_01_00011878

addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime(s) under investigation. Such information allows investigators to understand the geographic and chronological context of Google access, use, and events relating to the crime under investigation. Finally, Google account activity may provide relevant insight into the Google account owner's state of mind as it relates to the offense under investigation. For example, information stored in the Google account may indicate the owner's motive and intent to commit a crime (*e.g.*, information indicating a plan to commit a crime), or consciousness of guilt (*e.g.*, deleting information in an effort to conceal evidence from law enforcement).

**D. Jurisdiction and Authority to Issue Warrant**

10. Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Provider, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

11. A search warrant under § 2703 may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

12. When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3). Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as

12.06.2018

USAO_SDNY_01_00011879

the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation.  18 U.S.C. § 2705(b).

## II.  Probable Cause

### A.  Probable Cause Regarding the Subject Offenses

13.     On or about December 13, 2022, the Honorable Gabriel W. Gorenstein authorized a complaint charging AVRAHAM EISENBERG with committing commodities fraud, in violation of 7 U.S.C. §§ 9(1), 13(a)(5) and 17 C.F.R. § 180.1, and commodities manipulation, in violation of 7 U.S.C. § 13(a)(2), in connection with a scheme to commit market manipulation on a platform called Mango Markets.  A copy of the complaint is attached hereto as Exhibit 1 and is incorporated by reference.

14.     As explained in the Complaint:

a.     Mango Markets is a decentralized cryptocurrency exchange that has its own native crypto token, called MNGO.  Investors can buy and sell MNGO and other cryptocurrencies on Mango Markets.  Investors on Mango Markets can also buy and sell perpetual futures ("Perpetuals") based on the relationship between the value of MNGO and the value of a crypto stablecoin called USD Coin ("USDC"), which is designed to be pegged to the dollar.  Perpetuals are "swaps" under the Commodity Exchange Act.  An investor who buys a Perpetual for MNGO stands to profit if the value of MNGO rises relative to the value of USDC, and an investor who sells a Perpetual for MNGO stands to profit if the value of MNGO falls relative to the value of USDC.  Finally, Mango Markets allows investors to borrow cryptocurrency from the exchange, in amounts based on the value of the borrower's portfolio, and to withdraw that borrowed cryptocurrency.  Compl. ¶¶ 4, 7-8.

b.     In or about October 2022, AVRAHAM EISENBERG participated in a scheme to steal approximately $110 million by artificially manipulating the price of MNGO Perpetuals on

26

USAO_SDNY_01_00011880

Mango Markets (the "Market Manipulation Scheme").   The scheme worked as follows: EISENBERG used an account that he controlled on Mango Markets to sell a large amount of Perpetuals for MNGO and used a separate account on Mango Markets to purchase those same Perpetuals.  In other words, EISENBERG sold himself MNGO Perpetuals.  EISENBERG then engaged in a series of large purchases of MNGO, with the objective of artificially increasing the price of MNGO relative to USDC, which had the effect of increasing the price of MNGO Perpetuals on Mango Markets.  That purchasing achieved the desired effect, causing the price of MNGO Perpetuals on Mango Markets to increase precipitously over the course of approximately 20 minutes.  Over that time span of approximately 20 minutes, the price of MNGO Perpetuals rose from approximately 0.0382 USDC/MNGO to approximately 0.54 USDC/MANGO, an increase of approximately 1300 percent.  Compl. ¶¶ 5, 9-17.

      c.  As the price of MNGO Perpetuals on Mango Markets rose as a result of the Market Manipulation Scheme perpetrated by AVRAHAM EISENBERG the value of the MNGO Perpetuals that EISENBERG had purchased also rose.  Because Mango Markets allows investors to borrow and withdraw cryptocurrency based on the value of their assets on the platform, the increase in the value of the MNGO Perpetuals EISENBERG had purchased allowed EISENBERG to borrow, then withdraw, approximately $110 million worth of various cryptocurrencies from Mango Markets, which came from deposits of other investors in the Mango Markets exchange. When EISENBERG borrowed and withdrew that cryptocurrency, he had no intention to repay the borrowed funds.  Accordingly, after EISENBERG borrowed and withdrew essentially all of the cryptocurrency deposits on the Mango Markets platform, EISENBERG ceased manipulating the price of MNGO Perpetuals, causing the price of MNGO Perpetuals to fall significantly.  Due to

12.06.2018

USAO_SDNY_01_00011881

EISENBERG's withdrawals, other investors with deposits on Mango Markets lost much, or all, of those deposits. Compl. ¶¶ 5, 9-17.

15.     As explained in the Complaint, virtual currencies, such as USDC, are "commodities" under the Commodity Exchange Act ("CEA"). See, e.g., *C.F.T.C. v. McDonnell*, 287 F. Supp. 3d 213 (E.D.N.Y. 2018) ("A 'commodity' encompasses virtual currency both in economic function and in the language of the statute."); *United States v. Reed*, No. 20 Cr. 500 (JGK), 2022 WL 597180, at *3 (S.D.N.Y. Feb. 28, 2022) (finding "defendant had ample notice from the broad definition of commodities under the CEA that cryptocurrencies were within the definition of commodities"). Accordingly, Perpetuals based on the relative value of MNGO and USDC are "swaps" under the CEA. See 7 U.S.C. § 1(47)(A).

16. Based on the foregoing, and the information in the Complaint, I respectfully submit there is probable cause to believe that AVRAHAM EISENBERG engaged in the Subject Offenses.[4]

### B.  Probable Cause Regarding the Subject Accounts and the Subject Servers

17.     As explained below, there is probable cause to believe that the Subject Accounts and the Subject Servers will contain evidence of the Subject Offenses.

### Subject Account-1 – Twitter Account

18. As explained above, **Subject Account-1** is a Twitter account with the username @avi_eisen ("Subject Account-2"), accessed at the URL https://twitter.com/avi_eisen.

19. There is probable cause to believe AVRAHAM EISENBERG uses **Subject Account-**

---

[4] Although the Complaint only charges commodities fraud and commodities manipulation, I respectfully submit that there is probable cause to believe that the conduct described in the Complaint and in this Affidavit also constitutes wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349, money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(h), and 1957, and conspiring to commit those offenses.

12.06.2018

USAO_SDNY_01_00011882

**1** because it has his name in the username and has, in the past, displayed a user photograph that I know was an image of EISENBERG based on my review of his passport photograph and other images of him.

20. Based on my review of publicly available posts on Twitter, there is probable cause to believe that **Subject Account-1** contains evidence of EISENBERG's involvement in the Market Manipulation Scheme.  Specifically:

a.  As explained above, on or about October 15, 2022, **Subject Account-1** displayed a post in which EISENBERG stated, in substance and in part, that he and others "operated a highly profitable trading strategy last week" that "took place on[] Mango Markets" and resulted in Mango Markets becoming "insolvent."

b.  On or about October 20, 2022, **Subject Account-1** also displayed a post stated, in part, that "Mango used switchboard, not Pyth."  Based on my review of publicly available records about Mango Markets, I understand that this is a reference to the type of "oracle" used by Mango Markets for setting the price of Perpetuals.

21. Moreover, based on my review of publicly available posts on Twitter, I have learned, in substance and in part, that **Subject Account-1** displays multiple posts of Department of Justice announcements related to financial fraud, including market manipulation, which is evidence that EISENBERG knew he was breaking the law when he committed the Market Manipulation Scheme.

22. Finally, based on my training and experience, and as explained above, I know that in addition to making public posts, Twitter users can also exchange "direct messages" with one another that are not publicly available.  There is probable cause to believe that EISENBERG uses the direct messaging function because, based on my review of publicly available Twitter posts, I

12.06.2018

USAO_SDNY_01_00011883

know that **Subject Account-1** has posted tweets that contain numerous references to EISENBERG communicating through "DM," which is a commonly used abbreviation for direct messaging.

### Subject Account-2 – Facebook Account

23. As explained above, **Subject Account-2** is a Facebook account with the username "Avraham Eisenberg", accessed at https://www.facebook.com/people/Avraham-Eisenberg/100009952574823/.

24. There is probable cause to believe that AVRAHAM EISENBERG uses **Subject Account-2** because the username is his name and publicly available photographs show EISENBERG, whom I recognize from reviewing EISENBERG's passport photograph and other images and videos of him.

25. There is probable cause to believe **Subject Account-2** will contain evidence of the Subject Offenses. Based on my participation in an interview of an individual ("Individual-1") who contacted law enforcement following the Market Manipulation Scheme,[5] I have learned, in substance and in part, the following:

a. Individual-1 met EISENBERG online approximately two years ago through Facebook. Individual-1 identified **Subject Account-2** as EISENBERG's Facebook account. Individual-1 and EISENBERG had shared mutual interests, so they communicated with one another over, among other things, Facebook Messenger (which is Facebook's messaging tool), Discord, and an encrypted messaging application called Signal.

b. EISENBERG communicated about the Market Manipulation Scheme before and after carrying it out on a Discord server called "CSP Trading," which is **Subject Server-1** and

---

[5] Individual-1 stated, in substance and in part, that Individual-1 was involved in cryptocurrency trading and was interested in potentially receiving compensation for providing information to law enforcement.

30

12.06.2018

USAO_SDNY_01_00011884

is discussed in greater detail below.  EISENBERG deleted some of his messages from **Subject Server-1** after carrying out the Market Manipulation Scheme.  Individual-1 described to me **Subject Server-1** and identified some of the places where EISENBERG had deleted messages.

c.  EISENBERG typically communicated with Individual-1 over Facebook and an encrypted messaging application called Signal.  Individual-1's communications with EISENBERG included communications about Mango Markets and EISENBERG leaving the country to Israel after committing the Market Manipulation Scheme because he was afraid of prosecution.  Individual-1 believed that these communications may have occurred on Signal, but was unsure.[6]

d.  Individual-1 also stated that EISENBERG communicated with Individual-1 and others over Facebook about cryptocurrency trading, including trading for which, I know based on publicly available records from Twitter and Discord, EISENBERG had been accused of fraud and market manipulation.

26. Based on my communications with other law enforcement officers and my review of travel records, I have corroborated that, on or about October 12, 2022—right after the Mango Market manipulation scheme—EISENBERG traveled from the United States to Israel, then returned to the United States on or about December 26, 2022.

**Subject Accounts-3 to -4 and Subject Server-1– Discord Accounts and Server**

27. Based on my training and experience, and as explained above, Discord is an online

---

[6] Individual-1 stated, in substance and in part, that Individual-1 had taken screenshots and screen recordings of his communications with EISENBERG about the Mango Market manipulation scheme.  Individual-1 stated that Individual-1 would send me those screenshots and recordings, but has not done so.  Individual-1 also stated, in substance and in part, that he did not know whether EISENBERG worked with others in committing the Subject Offenses, but believed EISENBERG worked alone.

31

12.06.2018

USAO_SDNY_01_00011885

service that is, among other things, a messaging platform where users can exchange text or voice messages. Discord users can create a "server" for free and then invite other users to join the server in order to communicate with another user. A server can be configured as public, meaning anyone can join, or it can be configured to be private. To participate in a private server, a user must be invited by another user who already belongs to that private server. Servers are broken down into subcategories, or "channels," where users can connect with each other by chatting or calling.

28. As explained above, **Subject Server-1** is a Discord server available at discord.gg/9RjPjCdGwK and with Server ID 782504674103656489.

29. Based on my review of messages from **Subject Server-1** and data from Discord, I have learned, in substance and in part, the following:

    a. **Subject Server-1** is named "CSP Trading," and that it contains multiple channels where users post messages.

    b. Numerous users post messages on **Subject Server-1**'s channels, including: (i) the user of **Subject Account-3**, which has the username AvrahamEisenberg#5451, the user ID 470697531823620116, and also uses the vanity name "Vires Creditor and Honest Person"; and (ii) the user of **Subject Account-4**, which has the username CrunchWrapSupreme#1469 and the user ID 281233046227779585 and also uses the vanity name "CSP Trading."

    c. There is probable cause to believe that EISENBERG uses **Subject Account-3** because, among other things, the username contains his name and the account lists the same address listed on a cryptocurrency account at Circle (identified in the Complaint as "Circle Account-1") that, as explained in the Complaint, I know EISENBERG uses because he provided his passport to open the account.

30. Based on my review of messages from **Subject Server-1**, there is probable cause to

12.06.2018

USAO_SDNY_01_00011886

believe that **Subject Server-1** will contain evidence of the Subject Offenses for, among other things, the following reasons:

      a.  On or about October 11 and October 12, 2022, multiple users on **Subject Server-1** wrote posts accusing EISENBERG, who was a regular poster on **Subject Server-1**, of being responsible for the Mango Market manipulation scheme.

      b.  On or about October 12, 2022, **Subject Account-3** made multiple posts on **Subject Server-1** making fun of Mango Markets. For example, at approximately 4:36 a.m., **Subject Account-3** posted a screenshot of a tweet from another user stating "Apple made $94 billion last year[,] Mangos lost $115 million today[,] Investing in fruit is unpredictable." Similarly, at approximately 4:43 a.m., **Subject Account-3** posted a link to a reddit page about the Mango Markets manipulation scheme and wrote, in part, "Comments here pretty positive . . . the mango discord suffers from selection bias."

      c.  **Subject Account-3** continued to post regularly on **Subject Server-1** through the rest of October, including about the Mango Markets manipulation scheme. For example:

      i.  On or about October 16, 2022, at approximately 10:25 p.m., **Subject Account-3** posted: "Protip: always make sure your odds of being a billionaire is greater than odds of being in jail[.] And you'll do fine."

      ii.  On or about October 17, 2022, at approximately 10:59 p.m., **Subject Account-3** posted a series of messages about having more Twitter followers than a leader of Mango Labs, which built Mango Markets.

      iii.  On or about October 19, 2022, at approximately 10:19 p.m., **Subject Account-3** posted a screenshot of odds about EISENBERG's future, including, among others, "[w]hich protocol will Avraham Eisenberg plunder next" and "[w]ill Avraham Eisenberg spend at

33

USAO_SDNY_01_00011887

least 6 months in jail before the end of 2030."

  iv. On or about October 20, 2022, at approximately 12:25 a.m., **Subject Account-3** posted a link to a Tweet about the Mango Market manipulation scheme being entertaining, followed by the text: "It's amazing how much funnier you get after you have 47 million dollars."

  v. On or about October 22, 2022, at approximately 6:50 p.m., **Subject Account-3** posted a link to a Tweet about an individual ("Individual-2") calling the Mango Markets manipulation scheme "market manipulation," followed by the text: "Big talk from market manipulator [Individual-2]" and asking for a link to information about Individual-2's market manipulation scheme.

  vi. On or about October 25, 2022, at approximately 8:09 a.m., **Subject Account-3** tweeted a link to a podcast in which EISENBERG was interviewed about the Mango Market manipulation scheme.

  31. There is also probable cause to believe that **Subject Accounts-3 and -4** contain evidence of the Subject Offenses, including in posts on servers other than **Subject Server-1**. Specifically, based on my review of messages on **Subject Server-1** and on a public article about the Mango Market manipulation scheme, I have learned, in substance and in part, the following:

  a. As explained above, EISENBERG used **Subject Account-3** and used that account to post frequently about the Mango Market manipulation scheme on **Subject Server-1**. Based on my training and experience, I know that individuals who use Discord often post on multiple servers, including private servers, because it allows them to talk with different groups of people or with specific individuals. Accordingly, there is probable cause to believe that **Subject Account-3** contains communications about the Subject Offenses beyond what is available on

12.06.2018

USAO_SDNY_01_00011888

**Subject Server-1.**

b. Consistent with my training and experience, there is probable cause to believe **Subject Account-3** communicated separately with **Subject Account-4** about efforts to cover up EISENBERG's planning for the Mango Market manipulation scheme. Specifically:

i. On or about October 12, 2022—which is after the Mango Market manipulation scheme but before EISENBERG admitted his involvement in that scheme—a publicly available post on Substack, which is a blogging platform, accused EISENBERG of committing the exploit and posted what appear to be messages from Discord, in which **Subject Account-3** posted about some of the steps that EISENBERG later took in carrying out the Mango Market manipulation scheme.

ii. **Subject Server-1** contains portions of the messages in the screen shots described above, but not all of them, and has notations that certain messages have been deleted. Based on my training and experience and my review of Discord servers, I understand this means that some of the messages that appeared on screenshots in the blog post described above were likely deleted.

c. Consistent with my training and experience, multiple users on **Subject Server-1** posted about incriminating messages from **Subject Account-3** being deleted from **Subject Server-1**. Those users accused the user of **Subject Account-4**, who was a moderator of **Subject Server-1**, of deleting messages at EISENBERG's request.

d. When confronted with these accusations, the user of **Subject Account-4** did not deny them and, at times, defended EISENBERG. For example:

i. On or about October 12, 2022, at approximately 12:20 a.m., a user who had posted screenshots of **Subject Account-3**'s posts that appeared on the blog post described above

35

USAO_SDNY_01_00011889

wrote a post directed at **Subject Account-4** asking, in substance and in part, whether **Subject Account-4** had deleted the screenshots. **Subject Account-4** cryptically responded, "go padres," then wrote "I hear hes already fled the usa."

ii. On or about October 12, 2022, at approximately 12:26 a.m., a different user asked, in substance and in part, why **Subject Account-4** would be deleting messages for EISENBERG. Approximately one minute later, **Subject Account-4** wrote: "avi did nothing wrong," using a shorthand for EISENBERG's first name.

iii. On or about October 12, 2022, at approximately 1:42 a.m., after additional attempts by other users to re-post **Subject Account-3's** incriminating messages, **Subject Account-4** posted: "[T]his should be a safe collaborative space to say what ur working on [without] worrying about people taking screenshots and posting them elsewhere," in an apparent reference to the blog post described above.

e. Based on my training and experience, the fact that the user of **Subject Account-4** appears to have been deleting messages from **Subject Server-1** for EISENBERG and appears to have known that EISENBERG left the United States shortly after the Mango Market manipulation scheme suggests that the users of **Subject Account-4** was communicating separately with EISENBERG about the aftermath of the Mango Market manipulation scheme.

### Subject Accounts-5 to -7 – Google Accounts

32. As explained above, **Subject Account-5** is a Google account associated with the email address bochen.clean@gmail.com, **Subject Account-6** is a Google account associated with the email address avi@thimessolutions.com, and **Subject Account-7** is a Google account associated with the email address 613ike@gmail.com.

33. I have learned that **Subject Account-5** was used to perpetrate the Market Manipulation

12.06.2018

USAO_SDNY_01_00011890

Scheme.  Specifically, based on my review of records from a cryptocurrency exchange (identified in the Complaint and herein as "Exchange-1"), as well as my review of records from Google, I have learned, in substance and in part, the following:

     a.  As explained in the Complaint, on or about September 19, 2022, an account (identified in the Complaint and herein as the "Exchange-1 Account") was opened at Exchange-1, using a passport and personal identifying information that appears to belong to a Ukrainian woman, along with the email address for **Subject Account-5**.  *See* Comp. ¶ 14.

     b.  As explained in the Complaint, the Exchange-1 Account received over 12 million USDC from Circle Account-1, which is EISENBERG's account at Circle, then sent a large portion of those funds to other cryptocurrency wallets that EISENBERG used to carry out the Market Manipulation Scheme.  *See* Compl. ¶ 10.

     c.  Moreover, as explained in the Complaint, the Exchange-1 Account purchased a large quantity of MNGO using USDC, as part of EISENBERG's effort to manipulate the price of MNGO Perpetuals in the Market Manipulation Scheme.  *See* Compl. ¶ 14.

34. I have also learned that EISENBERG appears to control the Exchange-1 Account and **Subject Account-5**, as well as **Subject Accounts-6 and -7**.  Specifically, based on my review of records from Google, I have learned, in substance and in part, the following:

     a.  As explained above, Circle Account-1, which is EISENBERG's account, sent over 12 million USDC to the Exchange-1 Account.  Based on my training and experience, I know that one account sending such a large amount of cryptocurrency to another account, without appearing to receive any cryptocurrency in return, is often strong evidence that the same individual owns both cryptocurrency accounts.

     b.  As explained above, the Exchange-1 Account was created on or about

12.06.2018

USAO_SDNY_01_00011891

September 19, 2022, using the email address for **Subject Account-5** as the email address for the account. Based on my review of records from Google, I have learned that **Subject Account-5** was created on or about September 1, 2022 – just a few weeks before the Exchange-1 Account was opened. Based on my training and experience, I know that individuals who commit financial fraud online often create new email accounts specifically for the criminal scheme, and the short period of time between **Subject Account-5** opening and the Market Manipulation Scheme is strong evidence that **Subject Account-5** was created specifically for the crime.

   c. Google records show that the recovery email address for **Subject Account-5** is the email address for **Subject Account-6**, which is registered to "Avi Eisenberg." Based on my participation in this investigation, I know that "Avi" is one of EISENBERG's nicknames. Moreover, **Subject Account-6** has, as a recovery email address, **Subject Account-7**, which is also registered to "Avraham Eisenberg." Finally, **Subject Account-5**, **Subject Account-6**, and **Subject Account-7** all have the same phone number ("Phone Number-1") listed as the recovery phone number.

   d. Phone Number-1 is also listed as the contact phone number for Circle Account-1, which I know is EISENBERG's account for the reasons given in the Complaint.

   e. Accordingly, there is probable cause to believe that EISENBERG controls **Subject Accounts-5** through -7.

  35. There is probable cause to believe **Subject Accounts-5** through -7 will contain evidence of, and are instrumentalities of, the Subject Offenses, for the following reasons:

   a. As explained above, **Subject Account-5** is the email address listed for the Exchange-1 Account, which was used to perpetrate the Market Manipulation Scheme. Data from **Subject Account-5** – including emails, payment information, chat records, location data, IP data,

12.06.2018

USAO_SDNY_01_00011892

and any saved documents or photographs – will provide information about the identity of the individual or individuals who created and used **Subject Account-5**, including to set up and access the Exchange-1 Account.

b. Similarly, as explained above, **Subject Account-6** is listed as the recovery email address for **Subject Account-5**. Data from **Subject Account-6** – including emails, payment information, chat records, location data, IP data, and any saved documents or photographs – will provide information about the identity of the individual or individuals who created and used **Subject Account-5**, including to set up and access the Exchange-1 Account. Moreover, because **Subject Account-6** preceded **Subject Account-5** and, as explained above, it appears that EISENBERG created **Subject Account-5** to commit the Market Manipulation Scheme using someone else's identity, there is probable cause to believe **Subject Account-6** will contain communications, documents, chats, and other records about the Market Manipulation Scheme, decision to use **Subject Account-5** rather than **Subject Account-6**, and efforts to obtain the personal identifying information used to create **Subject Account-5** and the Exchange-1 Account.

c. Additionally, as explained above, EISENBERG controls **Subject Account-7** and listed that account as the recovery email address for **Subject Account-6**. Google records show that **Subject Account-7** includes a "Google Voice" account for Phone Number-1. As explained above, Phone Number-1 is listed as the contact phone number for **Subject Account-6**, **Subject Account-5**, and Circle Account-1. Accordingly, data from **Subject Account-7** – including emails, payment information, chat records, location data, IP data, and any saved documents or photographs – will provide information about the identity of the user of Phone Number-1 and, therefore, the users of **Subject Account-6**, **Subject Account-5**, and Circle Account-1.

d. Google records show that the user of **Subject Account-7** (who, as explained

39

12.06.2018

USAO_SDNY_01_00011893

above, is believed to be EISENBERG) accessed **Subject Account-7** in the days leading up to the Market Manipulation Scheme, the day of the Market Manipulation Scheme, and the days after the Market Manipulation Scheme. That access included using Phone Number-1 to send and receive phone calls, receive voice messages, and send and receive text messages. As explained above and in the Complaint, I know that EISENBERG communicated with others about the Market Manipulation Scheme both before and after the crime, and that he publicly referred to committing the Market Manipulation Scheme with a team. Accordingly, there is probable cause to believe that **Subject Account-7** will contain communications about the Subject Offenses, as well as information that will help identify any co-conspirators in the Subject Offenses.

36. Finally, based on my training and experience, I know that individuals involved in financial crimes often use Google accounts, such as **Subject Accounts-5** through -7, to receive, send, and store financial information, including information about bank accounts and cryptocurrency accounts. Individuals also often us Google accounts to receive, send, store, and maintain ledgers and documents, including ledgers containing information about the location of assets and documents reflecting research about cryptocurrency platforms and potential fraud schemes.

37. For the foregoing reasons, there is probable cause to believe that **Subject Accounts-5** through -7 will contain evidence of, and are instrumentalities of, the Subject Offenses.

38. **Time Limitation.** As described above, the Market Manipulation Scheme took place principally on or about October 11, 2022, when the trades and movements of cryptocurrency discussed above were executed. Based on my training and experience and my participation in this investigation, I know that the Market Manipulation Scheme likely took months to plan because it required millions of dollars' worth of cryptocurrency and a detailed understanding of complicated

12.06.2018

USAO_SDNY_01_00011894

facts about Mango Markets, such as the prices used by the Mango Markets "oracle" and the amount of MNGO purchasing needed to significantly increase the price of MNGO Perpetuals. Moreover, based on my training and experience and my participation in this investigation, I know that EISENBERG likely continued to create evidence of the Market Manipulation Scheme for months after October, both through moving the proceeds of that offense and discussing it with others, including in the podcasts described above. Accordingly, I respectfully request that the warrants authorize the collection of data from July 1, 2022 to the present.

### C. Evidence, Fruits and Instrumentalities

39. Based upon the foregoing, I respectfully submit there is probable cause to believe that information stored on the Providers' servers associated with the Subject Accounts and the Subject Server will contain evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Section II of Attachment A to the proposed warrant, which is incorporated by reference herein.

40. In particular, I believe the Subject Accounts and the Subject Server are likely to contain the following information:

a. Records relating to the creation and users of the Subject Accounts and the Subject Servers;

b. Evidence of the creation and use of cryptocurrency wallets and accounts on cryptocurrency exchanges used in preparing for, perpetrating, or receiving funds from the Subject Offenses;

c. Evidence, including documents, images, and communications, reflecting any preparation for the Subject Offenses, including but not limited evidence reflecting research about manipulating cryptocurrency prices; research about potential targets for market manipulation; tests of purchasing and selling MNGO or MNGP Perpetuals; tests of transferring cryptocurrency to and

41

USAO_SDNY_01_00011895

from Mango Markets and other cryptocurrency exchanges used in the Subject Offenses; the planned steps in the Subject Offenses; the anticipated timing of the Subject Offenses; and planning for laundering funds from the Subject Offenses;

d.   Evidence, including documents, images, and communications, reflecting acts in furtherance of the Subject Offenses and the transfer of funds obtained from the Subject Offenses;

e.   Evidence, including documents, images, and communications, reflecting efforts to avoid to destroy or conceal information about the Subject Offenses, including but not limited to efforts to delete messages about the Subject Offenses and to prevent victims of the Subject Offenses from reporting information about the scheme to law enforcement;

f.   Evidence, including documents, images, and communications, relating to AVRAHAM EISENBERG's relocation from the United States to Israel shortly after committing the Subject Offenses;

g.   Evidence, including documents, images, and communications, reflecting AVRAHAM EISENBERG's knowledge of the laws prohibiting wire fraud, securities fraud, commodities fraud, and market manipulations, including but not limited to evidence of EISENBERG's participation in lawsuits involving laws related to those subjects and EISENBERG's research or communication about lawsuits and criminal cases related to those subjects;

h.   Evidence reflecting the identities of, and communications among, any co-conspirators in the Subject Offenses;

i.   Evidence, including documents and communications, reflecting the state of mind of AVRAHAM EISENBERG and other participants in the Subject Offenses, including

12.06.2018

USAO_SDNY_01_00011896

communications reflecting false (purportedly exculpatory) explanations of any participant's involvement in the Subject Offenses;

j.   Information that would assist in identifying and locating victims or witnesses;

k.   Documents, spreadsheets, communications, and ledgers tracking cryptocurrency transfers and/or cryptocurrency payments;

l.   Passwords or other information needed to access or identify computer or other online accounts, storage media, or other places where additional evidence, fruits, or instrumentalities of the Subject Offenses may be located;

m.   Information pertaining to cryptocurrency digital wallets that may contain proceeds of the Subject Offenses;

n.   Information relating to the ownership and disposition of criminal proceeds, including bank accounts, cryptocurrency wallets, accounts with centralized cryptocurrency exchanges, and other financial accounts;

o.   Evidence relating to the use of financial accounts and transactions in furtherance of the Subject Offenses (including the means and methods used to obtain the accounts and funds therein, and how the transactions were undertaken);

p.   Evidence concerning the technical expertise of AVRAHAM EISENBERG and any other participants in the Subject Offenses;

q.   Location data, including but not limited to geolocation reporting and location history data and metadata associated with other files that would place AVRAHAM EISENBERG and any co-conspirators and aiders and abettors in the Subject Offenses, as well as the devices they used, in specific places at specific times, and would indicate the use of their devices during those times;

43

12.06.2018

r.   Information regarding the registration of other email accounts, computer servers, or other computer network infrastructure, including servers and Internet domains, or online communications facilities, payment for such online facilities or services, transfers of funds in furtherance of the Subject Offenses, and proceeds of the Subject Offenses; and

s.   Evidence concerning any other online accounts, any computer devices or servers, or any other location where evidence falling within the foregoing categories could be stored, including any passwords or encryption keys needed to access such evidence.

2.   In addition to there being probable cause that the Subject Accounts and Subject Server contain evidence of the Subject Offenses, there is also probable cause to believe that they are instrumentalities of the Subject Offenses. Based on my training and experience, my conversations with other law enforcement officers, and my participation in this investigation, I know that when an individual uses electronic accounts to engage in financial crimes, including market manipulation, those accounts will generally serve both as an instrumentality for committing the crime and as a storage medium for evidence of the crime. The accounts are instrumentalities of the crime because they were a means of committing the criminal offense.

## III.   Review of the Information Obtained Pursuant to the Warrant

41.   Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service of a search warrant issued under § 2703, or for the collection or production of responsive records. Accordingly, the warrant requested herein will be transmitted to the Provider, which shall be directed to produce a digital copy of any responsive records to law enforcement personnel within 30 days from the date of service. Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will retain the records and review them for evidence, fruits, and

44

12.06.2018

USAO_SDNY_01_00011898

instrumentalities of the Subject Offenses as specified in Section III of Attachment A to the proposed warrant.

42.     In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all emails within the Subject Account.  This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure.  Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure.  As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text.  Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

## IV.  Request for Non-Disclosure and Sealing Order

43.     The existence and scope of this ongoing criminal investigation is not publicly known.  As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation.  The targets of this investigation include sophisticated computer users who known to use computers and electronic communications in furtherance of their activity and thus could easily delete, encrypt, or otherwise conceal such digital evidence from law enforcement were they to learn of the Government's

12.06.2018

USAO_SDNY_01_00011899

investigation. *See* 18 U.S.C. § 2705(b)(3). In light of my background and experience, I know that in many cyber investigations, targets have destroyed internet infrastructure and deleted accounts and servers upon learning that the infrastructure may have been identified as being part of the criminal scheme. *See* 18 U.S.C. § 2705(b)(3).

44. Accordingly, there is reason to believe that, were the Providers to notify the subscribers or others of the existence of the warrant, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Providers not to notify any person of the existence of the warrant for a period of one year from issuance, subject to extension upon application to the Court, if necessary.

45. For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

**V. Conclusion**

46. Based on the foregoing, I respectfully request that the Court issue the warrant sought herein pursuant to the applicable provisions of the Stored Communications Act, 18 U.S.C.

12.06.2018

USAO_SDNY_01_00011900

Case 1:23-cr-00010-RMB   Document 30-10   Filed 07/28/23   Page 71 of 71

§ 2703(b)(1)(A) (for contents) and § 2703(c)(1)(A) (for records and other information), and the

relevant provisions of Federal Rule of Criminal Procedure 41.

/s authorized electronic signature

BRANDON RACZ
Special Agent, FBI

Sworn to me through the transmission of this
Affidavit through reliable electronic means, pursuant to
Federal Rules of Criminal Procedure 41(d)(3) and 4.1,
this 6t day of January, 2023

HONORABLE SARAH NETBURN
United States Magistrate Judge
Southern District of New York

12.06.2018

47

USAO_SDNY_01_00011901