UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

AVRAHAM EISENBERG,

                Defendant.

23-cr-10 (AS)

ORDER & OPINION

ARUN SUBRAMANIAN, United States District Judge:

Defendant Avraham Eisenberg moves to dismiss the indictment against him for failure to state an offense. Fed. R. Crim. P. 12(b)(3)(B)(v). For the following reasons, that motion is denied. The denial is without prejudice to a Rule 29 motion for judgment of acquittal after the close of the government's evidence and, if that motion is not granted, then after the close of all evidence.

## BACKGROUND

The indictment charges Eisenberg with commodities fraud, commodities manipulation, and wire fraud. The following facts are in the indictment and are accepted as true for this motion. On October 11, 2022, Eisenberg set up two accounts on the cryptocurrency exchange Mango Markets that "did not appear to the public" to be controlled by him. Indictment, Dkt. 4 ¶ 3. Eisenberg used those accounts to sell himself "MNGO Perpetuals." MNGO Perpetuals increase in value if one crypto token, MNGO, goes up in value relative to another token, USDC. And they go down in value if MNGO loses value versus USDC. Dkt. 4 ¶¶ 2-3.

After selling himself these MNGO Perpetuals, Eisenberg—on different exchanges tracked by Mango Markets—"made a series of large purchases of MNGO using USDC, with the objective of artificially increasing the price of MNGO relative to USDC and, in turn, the price of MNGO Perpetuals." *Id*. ¶ 3. Eisenberg made these purchases using two accounts: one that was "registered to a different person" (the "Exchange-1 Account") and a separate anonymous account that he set up with bogus location information to "circumvent Exchange-2's restrictions on traders from the United States" (the "Exchange-2 Account"). *Id*. ¶ 17b, f.

As the price of MNGO rose, so did the value of Eisenberg's MNGO Perpetuals. In fact, Eisenberg's trades caused the price of MNGO Perpetuals to spike by 1300%. *Id*. ¶ 18. Eisenberg took advantage of the price hike. Using an attribute of the Mango Markets platform that lets users borrow against their assets and then withdraw the borrowed proceeds, Eisenberg borrowed and then withdrew approximately $110 million worth of crypto from Mango Markets based on

his stake in MNGO Perpetuals. *Id*. ¶ 4. The indictment alleges that Eisenberg had "no intention of repaying the borrowed funds but rather to steal those funds." *Id*. ¶ 5.

After Eisenberg stopped buying MNGO, the value of MNGO Perpetuals plummeted. This made Eisenberg's account holding the Perpetuals subject to liquidation. But there was nothing to liquidate. Eisenberg had already withdrawn the $110 million in crypto and the MNGO Perpetuals left in the account were worthless. *Id*. ¶ 22.

Based on these facts, count one of the indictment charges Eisenberg with commodities fraud in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1, which prohibit the use of a "manipulative device" "in connection with" "a swap" or "a contract of sale of any commodity." The "willful" violation of these provisions is a felony under 7 U.S.C. § 13(a)(5). Count two charges Eisenberg with commodities manipulation in violation of 7 U.S.C. § 13(a)(2), which makes it a felony to "manipulate or attempt to manipulate the price of any commodity . . . or of any swap." Count three charges Eisenberg with wire fraud in violation of 18 U.S.C. § 1343. The indictment says that Eisenberg's conduct involved "a swap" and "a contract of sale of a commodity." Dkt. 4 ¶ 23. Among the manipulative and deceptive acts alleged in the indictment are "the intentional and artificial manipulation of the relative value of USDC and MNGO and the price of perpetual futures contracts on Mango Markets," "misrepresenting [Eisenberg's] intentions to borrow cryptocurrency from Mango Markets," and "using false personal identifying and location information." *Id*. ¶ 23.

## DISCUSSION

### A. Legal Standard

When considering a motion to dismiss an indictment, "the facts alleged by the government must be taken as true." *United States v. Velastegui*, 199 F.3d 590, 592 n.2 (2d Cir. 1999). "An indictment is sufficient as long as it (1) contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and (2) enables the defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Wedd*, 993 F.3d 104, 120 (2d Cir. 2021) (cleaned up).

Under normal circumstances, an indictment "need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *Id.* (citation omitted). That is, it need only describe the "core of criminality to be proven at trial" and not "the particulars of how a defendant effected the crime." *United States v. D'Amelio*, 683 F.3d 412, 417–18 (2d Cir. 2012). "[A]t the indictment stage, [courts] do not evaluate the adequacy of the facts to satisfy the elements of the charged offense." *United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021) (quoting *Wedd*, 993 F.3d at 121). In *Dawkins*, the defendant argued that the facts alleged didn't make out the charged crimes absent "additional showings." *Id.* The Second Circuit held that these details weren't required at the motion-to-dismiss stage. Instead, checking for those facts "is something we do after trial." *Id.* (quoting *Wedd*, 993 F.3d at 121). Otherwise, "we would effectively be asking district courts to engage in

summary judgment proceedings—something that 'does not exist in federal criminal procedure.'" *Id*. (quoting *Wedd*, 993 F.3d at 121).

Given the limited nature of the Court's review on a motion to dismiss, dismissal of an indictment is a "drastic remedy that should be utilized with caution and only in extreme cases." *United States v. Walters*, 910 F.3d 11, 26 (2d Cir. 2018) (citation omitted).

**B. Eisenberg's Arguments for Dismissal**

**1. Counts One and Two: Failure to Allege an Instrument Falling Under the Commodities Exchange Act (CEA)**

Eisenberg first argues that the commodities-fraud and -manipulation counts must be dismissed because the indictment fails to allege that he traded an instrument covered by the CEA. Dkt. 28 at 10–14. As noted above, for commodities fraud, 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1 prohibit any manipulative device in connection with "any swap" or "a contract of sale of any commodity." The government says that MNGO Perpetuals are "swaps" and that Eisenberg executed "contracts of sale of" USDC, which the government says is a "commodity." For commodities manipulation, 7 U.S.C. § 13(a)(2) prohibits manipulating "the price of . . . any commodity" or "of any swap." Once again, the government says that MNGO Perpetuals are swaps. The government doesn't rely on USDC for this count.

Eisenberg argues that the indictment doesn't say that MNGO Perpetuals are swaps or that USDC is a commodity. Dkt. 37 at 2. That's true. While the complaint that preceded the indictment did allege that "Perpetuals are 'swaps'" and "virtual currencies, such as USDC, are 'commodities,'" Dkt. 1 ¶¶ 4, 8, the indictment doesn't label each of the financial instruments involved. But it does say that Eisenberg's offenses involved "a swap" and "a contract of sale of a commodity." Dkt. 4 ¶¶ 23, 25. And the indictment is clear about what transactions are at issue and when they occurred, as well as what instruments they involved: Eisenberg sold himself MNGO Perpetuals and subsequently sold USDC to purchase MNGO, all on or about October 11, 2022. The indictment does far more than "track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *Wedd*, 993 F.3d at 120.

Eisenberg cites no authority indicating that dismissal is appropriate simply because the indictment does not expressly apply the legal labels to the factual allegations. Even without that application, the indictment "fairly inform[s] [him] of the charge against which he must defend." *Wedd*, 933 F.3d at 120; *see also id*. at 121 ("To be sure, the Indictment does not detail the specific facts of the underlying schemes or precisely *how* Wedd and his co-defendants 'use[d]' consumers' telephone numbers. But there is no requirement that an indictment contain such detail.").

Eisenberg also suggests that MNGO Perpetuals are not swaps covered by the CEA, or at least that the indictment doesn't allege enough to make that determination. He notes that the Securities and Exchange Commission, in a separate action against Eisenberg, has alleged that MNGO is a security. Dkt. 37 at 4 (citing *SEC v. Eisenberg*, No. 23 Civ. 503 (S.D.N.Y. Jan. 20, 2023), Dkt. 1 ¶ 1). Eisenberg says that if the SEC is right, then the MNGO Perpetuals "would

3

potentially" be so-called security-based swaps outside the CEA's ambit. *Id.* But Eisenberg does not himself argue that MNGO Perpetuals are security-based swaps, and as he acknowledges, some security-based swaps—so-called mixed swaps—are covered by the CEA. Dkt. 37 at 4 (citing 7 U.S.C. § 1a(47)(B)(x)). Even if MNGO is a security, MNGO Perpetuals may qualify as mixed swaps, given that they are also based on USDC, which the government says is a commodity. *See* 7 U.S.C. § 1a(47)(D) (defining mixed swaps as security-based swaps that are also "based on the value of 1 or more . . . commodities"). Though Eisenberg does not concede that USDC is a commodity, he also fails to offer any explanation as to why it doesn't fit the statutory definition. *See* Dkt 66 at 6 n.9. In any event, the Court cannot resolve the classification of MNGO Perpetuals or USDC one way or the other at this juncture, given that these calls can't be made without a factual record. *See, e.g.*, *SEC v. Rorech*, 673 F. Supp. 2d 217, 225 (S.D.N.Y. 2009) (whether instrument was a security-based swap "raise[d] questions of fact").

Eisenberg insists that the indictment had to do more to clarify precisely what kind of swaps MNGO Perpetuals are and why. Dkt. 66 at 6–7. But cases like *Dawkins* and *Wedd* make clear that an indictment is not required to contain this level of detail. *Dawkins,* 999 F.3d at 780 ("The defendants interpret § 666(a)(2) to require additional showings for someone to be an 'agent,' and for activities to be part of a university's 'business.' But '[a]t the indictment stage, we do not evaluate the adequacy of the facts to satisfy the elements of the charged offense. That is something we do after trial.'" (quoting *Wedd*, 993 F.3d at 121)). To be clear, if the government wants to rely on the theory that MNGO Perpetuals are swaps at trial, it will need to prove that they fit the statutory definition. Eisenberg may argue at trial or on a Rule 29 motion that the government has failed to make its case, or that conflicting positions taken by the SEC or CFTC in their cases against him should constrain the government here.

Eisenberg also questions whether USDC can serve as a basis for the commodities-fraud count because the MNGO-USDC transactions were not contracts of sale "of USDC," but rather were contracts of sale "of MNGO," which the SEC has alleged is a security. Eisenberg says that USDC functioned as the "medium of exchange," not the object of the transaction. Dkt. 37 at 5. This argument is live for Eisenberg to advance at trial. The parties' presentation at the hearing on this motion left it with questions about the nature of the alleged manipulation, the MNGO-USDC trades alleged, and the nature of USDC. But these questions require a factual record to evaluate. And because the indictment alleges a swap sufficient to deny the motion to dismiss on the commodities counts, the Court need not address Eisenberg's argument about USDC at this time.

Finally, Eisenberg says that the commodities charges should be dismissed based on *Chevron* deference, the rule of lenity, or the major-questions doctrine. *See* Dkt. 28 at 24–27; Dkt. 37 at 15–17. *Chevron* deference generally kicks in where (1) there is an ambiguity in a statute, and (2) there's a reasonable interpretation of that statute by an agency charged with administering it. *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 507 (2d Cir. 2017). As to either the swap or commodity question, Eisenberg doesn't point to an agency interpretation of an ambiguous statute—let alone an agency interpretation going his way—so *Chevron* deference would not apply here.

4

The rule of lenity applies where there is an "ambiguous question[] of law." *United States v. Gonzalez*, 407 F.3d 118, 124 (2d Cir. 2005); *see also id.* ("[T]he touchstone of the rule of lenity is statutory ambiguity." (quoting *Bifulco v. United States*, 447 U.S. 381, 387 (1980)). While Eisenberg argues unfairness in construing MNGO Perpetuals as swaps or USDC as a commodity, he doesn't point to any specific statutory or regulatory provision that is ambiguous. General claims of unfairness, untethered to a specific ambiguity in a governing legal provision, do not provide a basis for application of the rule of lenity. *See Gonzalez*, 407 F.3d at 124 ("[T]he rule of lenity is not a catch-all maxim that resolves all disputes in the defendant's favor—a sort of juristical 'tie goes to the runner.'").

As for the major-questions doctrine, it applies where an agency claims "regulatory power over a significant portion of the American economy." *West Virginia v. EPA*, 142 S. Ct. 2587, 2605, 2608 (2022) (cleaned up). In this case, the Court is not reviewing the propriety of any agency action, and Eisenberg cites no authority for applying the major-questions doctrine in the context of a single criminal case. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2372 (2023) (characterizing *West Virginia v. EPA* as involving "concerns over the exercise of administrative power"); *cf. FTC v. Kochava Inc.*, 2023 WL 3249809, at *13 (D. Idaho May 4, 2023) (explaining that the doctrine is "inapplicable" where the agency "is not flexing its regulatory muscles" but "merely asking a court to interpret and apply a statute"). Contrary to Eisenberg's suggestion, this case does not involve the CFTC, the scope of its authority, or whether all digital assets should be treated as commodities. It involves the specific instruments at issue in this case. *Compare Nebraska*, 143 S. Ct. at 2373 (applying doctrine where "[t]he 'economic and political significance' of the Secretary's action is staggering by any measure" (quoting *West Virginia*, 142 S. Ct. at 2608)); *id.* at 2378 (Barrett, J., concurring) ("The doctrine serves as an interpretive tool reflecting 'common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency.'" (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)). Whatever the reach of the major-questions doctrine in other contexts, there is no basis to employ it here to depart from the plain and ordinary meaning of the law.

### 2. Counts One and Three: Failure to Allege a Misrepresentation or Omission in Connection with a Swap or Commodity

Eisenberg next argues that on the commodities fraud count, the indictment fails to allege a "misrepresentation or omission" "in connection with" a swap or contract of sale of a commodity. Dkt. 28 at 14–16. But the indictment does allege that Eisenberg "provid[ed] false information about his location" and used an account "registered to a different person" to make the purchases that artificially inflated the value of MNGO Perpetuals. Dkt. 4 ¶¶ 17b, f. It also alleges that he "purported to be borrowing" cryptocurrency from the MNGO Markets platform but "had no intention of repaying." *Id.* ¶ 21. At trial, Eisenberg can challenge whether the Government's evidence is sufficient to show a misrepresentation, but evaluating that challenge now is premature. *See Perez*, 575 F.3d at 166–67.

5

Plus, commodities fraud does not require a misrepresentation or omission. Though 17 C.F.R. § 180.1(a)(2) bars misleading statements and omissions of material fact, 17 C.F.R. § 180.1(a)(1) sweeps more broadly. It bars the use of a "manipulative device, scheme, or artifice to defraud." In the securities context, the Second Circuit has explained that manipulative "refers generally to practices … intended to mislead investors by artificially affecting market activity." *Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 76 (2d Cir. 2021). "For market activity to artificially affect a security's price, we generally ask whether the transaction or series of transactions sends a false pricing signal to the market or otherwise distorts estimates of the underlying economic value of the securities traded." *Id.* (cleaned up). Of course, a security's price cannot be "artificially" affected if a transaction's "terms are fully disclosed." *Id.* at 76–77. But the artificial market price need not result from "the injection of false information." *SEC v. Vali Mgmt. Partners*, 2022 WL 2155094, at *2 (2d Cir. June 15, 2022). "[I]n some cases[,] scienter is the only factor that distinguishes legitimate trading from improper manipulation." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007).

The indictment alleges that Eisenberg sent a false signal to the market with the intent to manipulate. Eisenberg purchased large quantities of MNGO with USDC in a short period of time to drive up the value of the MNGO Perpetuals he was holding. Dkt. 4 ¶¶ 16–17. The terms of these transactions were not fully disclosed: Eisenberg did not disclose that (1) he was behind both the purchase of large amounts of MNGO Perpetuals and the near-simultaneous purchase of large amounts of MNGO using USDC, (2) his goal was to inflate the price of MNGO Perpetuals, or (3) he had no intent to repay the cryptocurrency he withdrew while the price of MNGO Perpetuals was artificially inflated. *Id.* ¶¶ 3, 16–17. Plus, the indictment alleges that Eisenberg "intended to and did artificially increase the price of MNGO Perpetuals." *Id.* ¶ 18. Those allegations are sufficient.

Eisenberg also argues that the indictment fails to allege that the manipulation was "in connection with" a swap or contract of sale of a commodity because Eisenberg did not deceive (or intend to deceive) investors in MNGO Perpetuals or USDC. Dkt. 37 at 4–5, 8. But as cases in the securities context make clear, the phrase "in connection with" is broad and does not require that the deception was directly targeted at other investors in the regulated market. *See, e.g.*, *United States v. O'Hagan*, 521 U.S. 642, 656 (1997) (deception was in connection with purchase or sale of a security "even though the person or entity defrauded is not the other party to the trade, but is, instead, the source of the nonpublic information"); *United States v. Khalupsky*, 5 F.4th 279, 290 (2d Cir. 2021).

For example, the defendant in *Khalupsky* was convicted of securities fraud for "us[ing] information from stolen, pre-publication press releases to execute advantageous securities trades." 5 F.4th at 285. On appeal, he argued that the evidence was insufficient "because any deception employed to obtain the releases did not target the investors." *Id.* at 290. Instead, the deception involved hacking into three newswires. *Id.* at 286. Still, the Second Circuit upheld his conviction, explaining that "[t]he deception need only be '*in connection with* the purchase or sale of any security.'" *Id.* at 290. And that requirement was satisfied because the hacking directly

6

"prompted" and "enabled" securities trading. *Id.* Here, the indictment alleges that Eisenberg's deception was "in connection with" a swap. Eisenberg's deception "prompted" his swaps; he bought MNGO Perpetuals because he intended to artificially inflate their price. Dkt. 4 ¶ 23. And his alleged deception also "enabled" him to profit from those swaps; Eisenberg was able to pledge them as collateral for a $110 million loan because he had artificially inflated their price.

Eisenberg argues that the Second Circuit's decision in *Chemical Bank v. Arthur Andersen & Co*, 726 F.2d 930 (2d Cir. 1984) demonstrates why there was no manipulative device employed "in connection with" the MGNO Perpetuals. But that case underscores that the alleged link here is sufficient. In *Chemical Bank*, one company, Frigitemp, pledged the stock of another company, Elsters, as collateral for a loan. *Id.* at 933. The lenders alleged that Arthur Andersen had misrepresented the financial condition of Frigitemp—not the value of the Elsters stock. *Id.* at 941–43. Because Arthur Andersen did not misrepresent the value of the pledged stock, the Second Circuit held that the "in connection with" requirement was not satisfied. *Id.* Here, by contrast, Eisenberg's deception centered on the value of the pledged swaps and his efforts to "artificially manipulat[e] the value of MNGO relative to USDC." Dkt. 4 ¶¶ 18–21. So *Chemical Bank* casts no doubt on whether the "in connection with" requirement is satisfied here. (Because the indictment sufficiently alleges that Eisenberg's deception was "in connection with" MNGO Perpetuals, the Court will not address Eisenberg's argument concerning USDC at this time.)

Similar to the arguments he makes as to commodities fraud, Eisenberg also argues that the indictment fails to allege "any deceptive statement or any deceptive conduct facially sufficient to charge wire fraud" (Count Three). Dkt. 28 at 28. He says his "alleged conduct was fully permitted on the Mango Markets platform, and he deceived no one." *Id.* That might be what the facts show at trial. But for present purposes, the indictment certainly alleges "a scheme to engage in some form of deception" in connection with Eisenberg's trades and his taking of $110 million in crypto from the Mango Markets platform. *United States v. Connolly*, 24 F.4th 821, 833 (2d Cir. 2022) ("To convict an accused of a wire fraud 'scheme to defraud' … the government need not prove an actual false statement so long as it proves a scheme to engage in some form of deception, such as a half-truth, *i.e.*, a 'representation stating the truth so far as it goes' but is nonetheless misleading because of the 'failure to state additional or qualifying matter.'" (citation omitted)); *United States v. Greenberg*, 835 F.3d 295, 306 (2d Cir. 2016) ("[T]he statutory language in both the mail and wire fraud statutes is broad enough to include a wide variety of deceptions intended to deprive another of money or property and we see no reason to read into the statutes an invariable requirement that the person deceived be the same person deprived of the money or property by the fraud." (cleaned up)). As discussed above, the indictment alleges that in quick succession, Eisenberg created a long position in MNGO Perpetuals, used MNGO-USDC trades to artificially inflate the price of the MNGO perpetuals, masked his identity with respect to the MNGO-USDC trades, borrowed and withdrew $110 million in crypto based on the inflated value of those perpetuals, and omitted that he had inflated the price of the perpetuals and had no intent to repay what he borrowed. This is enough to sustain the wire fraud claim at this juncture.

Eisenberg claims that there is no nexus between his allegedly deceptive conduct and his receipt of crypto from Mango Markets. For instance, as to his efforts to mask his identity, Eisenberg says that "anonymity and programmer code names are common and accepted in the technology business." Dkt. 28 at 28. And as to his borrowing and withdrawal of the crypto from Mango Markets, he says "Mango Markets had no processes that would have prevented the withdrawal were Mr. Eisenberg's name used," and there "was no deception that would have changed or affected the amount of collateral withdrawn." *Id*. These arguments turn on facts outside of the indictment. Eisenberg will have full opportunity to raise them at trial and in a Rule 29 motion if he chooses, but they are not appropriate grounds for dismissal of the indictment. *Dawkins*, 999 F.3d at 780.

### 3. Counts One and Two: Due Process

Finally, Eisenberg argues that the commodities-fraud and -manipulation counts are unconstitutionally vague as applied to his conduct, violating the Due Process Clause. He says that the definition of what is a "manipulative" device—and specifically what it means to "artificially" affect the price of a swap or commodity—is vague. Dkt. 28 at 16-18. "When the challenge is vagueness as applied to a defendant's conduct, there is a two-part test: a court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it." *United States v. Nadi*, 996 F.2d 548, 550 (2d Cir. 1993) (cleaned up). Outside the First Amendment context, the Court assesses vagueness "in light of the specific facts of the case at hand." *United States v. Rybicki*, 354 F.3d 124, 129 (2d Cir. 2003) (citation omitted). Given the focus on factual specificity, a defendant's vagueness-as-applied challenge is often premature at the indictment stage. *Phillips*, 2023 WL 5671227, at *13 (collecting cases).

Consistent with *Phillips* and other authorities, the Court declines to resolve Eisenberg's vagueness challenge at this stage. The Supreme Court has made clear that on a vagueness challenge, the "touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the *defendant's conduct* was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997) (emphasis added). In this case, the government and Eisenberg take divergent views on what Eisenberg's conduct was. Eisenberg says that all he did was engage in open-market trades that no one would understand to be unlawful. The Government contends that Eisenberg knowingly engaged in deceptive conduct to artificially inflate the value of the MNGO Perpetuals in his account for the purpose of robbing Mango Markets and its investors of $110 million in cryptocurrency. The Court can't resolve those disputes at this stage, and it hesitates to prejudge what might be a viable constitutional challenge to the government's case when the cards are all on the table. For that reason, as in *Phillips*, "the Court requires full factual development at trial before it can determine whether the CEA . . . statutes failed to provide Defendant fair warning that his conduct was prohibited by law, as required by the Due Process Clause." 2023 WL 5671227, at *13.

## CONCLUSION

For the reasons stated above, the motion to dismiss the indictment is denied. However, this denial is without prejudice to Eisenberg raising his arguments by way of a Rule 29 motion for judgment of acquittal after the close of the government's evidence and, if the motion is not granted, then after the close of all evidence.

SO ORDERED.

Dated: December 18, 2023
      New York, New York

                                                     ARUN SUBRAMANIAN
                                                     United States District Judge